Honorable James L. Robart

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

Juweiya Abdiaziz ALI; A.F.A., a minor; Reema
Khaled DAHMAN; G.E., a minor; Jaffer
Akhlaq HUSSAIN; Seyedehfatemeh
HAMEDANI; Olad Issa OMAR; Faduma Olad
ISSA; F.O.I., a minor; and S.O.I., a minor; on
behalf of themselves as individuals and on
behalf of others similarly situated,

        Plaintiffs,

vs.

Donald TRUMP, President of the United States
of America; Jefferson B. SESSIONS, Attorney
General; U.S. DEPARTMENT OF STATE; Rex
W. TILLERSON, Secretary of State; U.S.
DEPARTMENT OF HOMELAND
SECURITY; John F. KELLY, Secretary of
Homeland Security; U.S. CITIZENSHIP AND
IMMIGRATION SERVICES; Lori
SCIALABBA, Acting Director of USCIS;
CUSTOMS AND BORDER PROTECTION;
Kevin K. McALEENAN, Acting Commissioner
of CBP; OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE; Michael
DEMPSEY, Acting Director of National
Intelligence,

        Defendants.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR          0

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

1.     Plaintiffs are four families who were, and continue to be, harmed by Defendant Trump's Executive Orders (EO), which unlawfully suspend the adjudication of immigrant visa applications of foreign nationals from specified Muslim-majority countries. Plaintiffs are 2 United States citizens, 2 lawful permanent residents, and 6 nationals, including four minors, of the countries targeted by the Executive Orders. They seek to be reunited and live as families in the United States. They also seek to represent a class of similarly situated persons harmed by the EOs.

2.     All Plaintiffs have diligently pursued the lengthy and rigorous immigrant visa process, which entails, inter alia, filing immigrant visa petitions and immigrant visa applications, paying hundreds of dollars in filing and processing fees, undergoing security screenings and medical examinations, and attending interviews before a consular officer.

3.     On January 27, 2017, Defendant Trump issued Executive Order 13769, "Protecting the Nation From Foreign Terrorist Entry Into the United States," 82 Fed. Reg. 8977 (Feb. 1, 2017) (EO1), which suspended visa adjudication and issuance for, as well as entry into the United States on validly issued visas of, nationals of seven Muslim-majority countries: Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen. After this Court enjoined EO1 in *Washington v. Trump*, No. 2:17-cv-141-JLR, ECF 2017 U.S. Dist. LEXIS 16012 (W.D. Wash. Feb. 3, 2017), Defendant Trump issued a second EO, to be effective on March 16, 2017, which targeted the same countries identified in EO1, with the exception of Iraq. Executive Order 13780, "Protecting the Nation From Foreign Terrorist Entry Into the United States," 82 Fed. Reg. 13780 (Mar. 6, 2017) (EO2),

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                                          1

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

EO2 re-institutes the suspension of visa adjudication and issuance for these countries and re-imposes the ban on entry for those without a valid visa on March 16, 2017.

4.      In targeting all nationals of seven majority-Muslim countries, EO1 unlawfully discriminates against Plaintiffs and proposed class members on the basis of their nationality and religion. EO2 does not remedy the unlawful discrimination against Plaintiffs and proposed class members on these bases, but rather continues it. These EOs have shattered Plaintiffs' lives by disrupting their ability to reunify with family members, conduct their business operations, and pursue employment. The EOs have had and will continue to have a similar, harmful impact on the scores of similarly situated families, U.S. businesses, and foreign national employees that Plaintiffs seek to represent through this action. These far-reaching executive orders contain an array of unlawful provisions with drastic consequences.

5.      By indefinitely suspending adjudication and issuance of immigrant visas to all foreign nationals of the targeted countries, based solely on their nationality, the EOs violate Congress' clear intent in 8 U.S.C. § 1152(a)(1) to prevent discrimination in the issuance of immigrant visas "because of the person's race, sex, nationality, place of birth, or place of residence." They also violate Plaintiffs' constitutionally protected rights to family, marriage, equal protection under the law, and freedom from government establishment of religion.

6.      Moreover, pursuant to EO2, Plaintiffs and proposed class members will be unable to move forward with their immigrant visa applications for an indefinite period of time. Defendants will not automatically lift either the suspension of visa adjudication and issuance or the ban on entry imposed by EO2 for any of the targeted countries at the end of the initial 90-day period. Rather, these will remain in effect until—and unless—each country satisfies certain as yet

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                                      2

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

1
2
3
4

unidentified information-sharing requirements, which may vary by country, for use in the visa adjudication process. EO2, § 2; *see also* EO2 § 1(f). EO2 states that removing Iraq from the ban was justified because of special conditions present there, including, inter alia, the "close cooperative relationship between the United States and the democratically elected Iraqi government, the strong United States diplomatic presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's commitment to combat ISIS." EO2, § 1(g). None of the other six countries has this combination of favorable conditions; to the contrary, each suffers from some combination of the following conditions that—at a minimum—will impede and delay successful negotiations over information sharing necessary to lift the ban: war, civil strife and unrest, absent or strained diplomatic relations with the United States, and lack of a U.S. embassy presence.

7.      Plaintiffs and prospective class members seek this Court's intervention to remedy the ongoing adverse impact of EO1 and to cease application of EO2 to Plaintiffs and proposed class members—U.S.-based petitioners who successfully petitioned for the immigration of a foreign national and nationals of the six designated countries who have applied for immigrant visas—to prevent ongoing and future harm to these individuals. Such intervention is needed to protect the integrity of the United States' immigrant visa process.

## JURISDICTION AND VENUE

8.      This case arises under the United States Constitution; the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 et seq.; the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    3

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

9.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331, as a civil action arising under the laws of the United States, and the Mandamus and Venue Act of 1962, 28 U.S.C. § 1361. Declaratory judgment is sought pursuant to 28 U.S.C. §§ 2201-02. The United States has waived its sovereign immunity pursuant to 5 U.S.C. § 702.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because Defendants are officers or employees of the United States or agencies thereof acting in their official capacities. A substantial part of the events or omissions giving rise to the claims occurred in this district, and Plaintiffs Juweiya Ali, Reema Dahman and Olad Issa Omar reside in this district, as do many putative class members. In addition, no real property is involved in this action.

## PARTIES

11.     Plaintiff Juweiya Abdiaziz Ali is a U.S. citizen who resides in Seattle, Washington.

12.     Plaintiff A.F.A. is her seven-year-old son. He is a citizen and resident of Somalia. Plaintiff A.F.A. has a pending immigrant visa application based on Plaintiff Ali's approved family-based immigrant visa petition filed on his behalf.

13.     Plaintiff Reema Khaled Dahman is Syrian citizen and a lawful permanent resident of the United States who resides in Seattle, Washington.

14.     Plaintiff G.E. is her 16-year-old son. He is a citizen and resident of Syria. Plaintiff G.E. has a pending immigrant visa application based on Plaintiff Dahman's approved family-based immigrant visa petition on his behalf.

15.      Plaintiff Jaffer Akhlaq Hussain is a citizen of Pakistan and a lawful permanent resident of the United States who resides in Parlin, New Jersey.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    4

Northwest Immigrant Rights Project
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

16.     Plaintiff Seyedehfatemeh Hamedani is the wife of Plaintiff Hussain. She is a citizen and resident of Iran. Plaintiff Hamedani has a pending immigrant visa application based on Plaintiff Hussain's approved family-based immigrant visa petition filed on her behalf.

17.     Plaintiff Olad Issa Omar is a 46-year-old naturalized citizen of the United States who resides in Seattle, Washington. Mr. Omar was born in Somalia.

18.     Plaintiff Faduma Olad Issa is the nineteen-year-old daughter of Plaintiff Omar. She was born in Kenya and resides in Kenya with her two siblings. Under Kenyan *jus sanguinis* law, she is a citizen of Somalia. She has a pending immigrant visa application based upon Plaintiff Omar's approved family-based visa petition filed on her behalf.

19.     Plaintiff F.O.I. is the seventeen-year-old daughter of Plaintiff Omar. She was born in Kenya and resides in Kenya with her two siblings. Under Kenyan *jus sanguinis* law, she is a citizen of Somalia. She has a pending immigrant visa application based upon Plaintiff Omar's approved family-based visa petition filed on her behalf.

20.     Plaintiff S.O.I. is the twelve-year-old son of Plaintiff Omar. He was born in Kenya and resides in Kenya with his two siblings. Under Kenyan *jus sanguinis* law, he is a citizen of Somalia. He has a pending immigrant visa application based upon Plaintiff Omar's approved family-based visa petition filed on his behalf.

21.     Defendant Donald Trump is the President of the United States. He is sued in his official capacity.

22.     Defendant Jefferson B. Sessions is the Attorney General of the United States. He is sued in his official capacity. Defendant Sessions has an integral role in the implementation of EO2. He is sued in his official capacity.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    5

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

23.     Defendant U.S. Department of State (DOS) is a cabinet department of the United States federal government. DOS has an integral role in the immigrant visa application and adjudication process.

24.     Defendant Rex W. Tillerson is the Secretary of State and as such is the chief foreign affairs adviser to the President. His responsibilities include administering DOS and supervising the administration of U.S. immigration laws abroad. He has an integral role in the implementation of EO2. He is sued in his official capacity.

25.     Defendant U.S. Department of Homeland Security (DHS) is a cabinet department of the United States federal government. DHS has an integral role in the immigrant visa application and adjudication process.

26.     Defendant John F. Kelly is the Secretary of DHS and is responsible for the administration and enforcement of the INA and oversight of all operations of DHS. He has an integral role in the implementation of EO2. He is sued in his official capacity.

27.     Defendant United States Citizenship and Immigration Services (USCIS) is a component of DHS responsible for, inter alia, adjudicating immigrant visa petitions filed on behalf of foreign nationals seeking to immigrate to the United States. USCIS plays an integral role in the immigrant visa application and adjudication process.

28.     Defendant Lori Scialabba is the Acting Director of USCIS and is responsible for its oversight and administration, including responsibility for USCIS' role in the immigrant visa application and adjudication process. She has an integral role in the implementation of EO2. She is sued in her official capacity.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    6

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

29.     Defendant Customs and Border Protection (CBP) is a component of DHS responsible for, inter alia, inspections of noncitizens who arrive at ports of entry and determining whether to admit or parole them into the United States. CBP has and will continue to play an integral role in implementing the EOs.

30.     Defendant Kevin K. McAleenan is the Acting Commissioner of CBP and is responsible for its oversight and administration, including CBP's role in implementing the EOs. He has an integral role in the implementation of EO2. He is sued in his official capacity.

31.     Defendant Office of Director of National Intelligence is assigned responsibility under the EOs to consult with DHS to determine what measures the affected countries will need to take in order to resume immigrant visa adjudication for their nationals.

32.     Defendant Michael Dempsey is the Acting Director of National Intelligence (DNI), and is responsible for its oversight and administration, including responsibility for DNI's role in vetting countries targeted by the EOs. He is sued in his official capacity.

## BACKGROUND

33.     The INA sets forth a rigorous multi-step application process for those seeking to obtain an immigrant visa to the United States. *See generally* 8 U.S.C. §§ 1153 and 1154.

34.     As an initial step, the government must receive and approve an immigrant visa petition. A qualifying U.S. citizen family member or employer must submit a visa petition on behalf of a foreign national beneficiary and pay an accompanying filing fee to USCIS, a subdivision of DHS, using either Form I-130 (Petition for Alien Relative) or Form I-140 (Petition for Alien Worker). In order to qualify for a family-based visa immigrant petition, the petitioner's relationship to the beneficiary must fall within a prescribed statutory classification. In general, in

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    7

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

order to qualify for an employment-based immigrant visa, the beneficiary must meet a variety of requirements, for example, qualification for the job that she seeks and a lack of U.S. workers available to take that job.

35.     Certain other limited categories of noncitizens are eligible to immigrate pursuant to the diversity visa program and other special immigrant visa programs established by legislation. These individuals apply for an immigrant visa by filing Form I-360 (Petition for Amerasian, Widow(er), or Special Immigrant) with USCIS.

36.     If USCIS approves the visa petition, the beneficiary of the petition is eligible to begin the process to apply to immigrate as soon as a visa number becomes available. If a visa number is immediately available, she may begin the process of applying for the immigrant visa immediately; if there is a backlog in the visa category in which she falls, she may wait months or years for a visa number to become immediately available. The length of the wait depends on factors such as the type of petition, the country of nationality, and/or the family or employment category for which a visa number is sought. *See* Visa Bulletin For March 2017, *available a*t https://travel.state.gov/content/visas/en/law-and-policy/bulletin/2017/visa-bulletin-for-march-2017.html.

37.     After USCIS approves an immigrant visa petition, the beneficiary (i.e., the immigrant visa applicant) faces additional fees, additional applications, and screening by the National Visa Center (NVC), a component of DOS. Once the additional fees are paid, the immigrant visa applicant must submit Form DS-260 (Immigrant Visa Electronic Application), and, in many cases, Form I-864 (Affidavit of Support).

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    8

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

38.     At this stage, DOS and DHS conduct a variety of security checks regarding the applicant's background and any possible criminal history. Pursuant to the Homeland Security Act of 2002 (HSA), P.L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002), the government created and implemented multiple additional visa security screening mechanisms, and on September 28, 2003, DHS and DOS entered into a Memorandum of Understanding "to create and maintain an effective, efficient visa process that secures America's borders from external threats and ensures that our borders remain open to legitimate travel to the United States." *Available at*: https://nationalimmigrationproject.org/PDFs/practitioners/practice_advisories/pr/dos-dhs-mou.pdf.

39.     Security checks include screening by Defendant DOS. Consular officers use the Consular Lookout and Support System (CLASS), which was reported in 2012 to contain more than 42.5 million agency records, including those from the FBI, Drug Enforcement Agency, and DHS, and the Consular Consolidated Database (CCD), which contains more than 143 million visa application records with biometric and biographic information. The CCD links with other databases controlled by DHS and the FBI, including DHS's Traveler Enforcement Compliance System (TECS), a substantial database of law enforcement and border inspection information, DHS's Automated Biometric Identification System (IDENT), and the FBI's Integrated Automated Fingerprint Identification System (IAFIS). DOS also uses facial recognition technology to screen visa applicants against a watchlist of photos of known and suspected terrorists obtained from the Terrorist Screening Center (TSC) and visa applicant photos contained in the CCD.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    9

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

40.     In addition to the extensive screening that each consular officer conducts in every case, the officers must send select visa cases for greater review by intelligence and law enforcement agencies, including the FBI and other counterterrorism agencies, for issuance of Security Advisory Opinions (SAOs).

41.     On information and belief, Defendant DHS also actively operates at least twenty-six Visa Security Units (VSUs) in at least twenty high-risk countries abroad, which are dedicated to performing visa security activities using law enforcement resources and databases not available to consular officers.

42.     Defendants also apply further interagency counterterrorism screening to all visa applicants, with specialized screening for cases referred for SAOs, drawing on the federal government's terrorism databases and watchlists.

43.     In addition to this vigorous screening process, immigrant visa applicants also must undergo a medical examination by an embassy-approved physician, and submit to a ten-fingerprint biometric scan, pursuant to the Enhanced Border Security and Visa Entry Reform Act of 2002, at the U.S. embassy or consulate before attending their visa interviews.

44.     After all necessary paperwork and agency screening of the beneficiary is completed, the U.S. embassy or consulate will issue an interview notice, requiring her to appear at a U.S. embassy or consulate. At the appointment, a consular officer interviews the immigrant visa applicant and reviews the wide range of supporting documents, including documentation of her medical exam, identity documents, documents establishing her visa eligibility, a police certificate, and any military or prison records.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                          10

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

45.     In order for a consular officer to grant an immigrant visa application, the officer must establish that the applicant is eligible for a visa and is not barred by various grounds of inadmissibility set forth in the INA, including national security-related grounds. *See*, *e.g.*, 8 U.S.C. § 1182(a)(3).

46.     If the consular officer approves the immigrant visa application, the person is issued an immigrant visa and accompanying paperwork in a sealed envelope (also known as an immigrant visa packet), which she must present upon arrival in the United States. At the time the individual receives the packet, she becomes an immigrant visa holder and must enter the United States within 6 months of the date her visa is issued.

47.     The individual presents the visa packet to a CBP inspecting officer at a port of entry. The officer reviews the visa packet and independently determines the individual's admissibility to the United States under 8 U.S.C. § 1182. Upon admission to the United States, the immigrant visa holder becomes a lawful permanent resident (LPR).

48.     Other noncitizens who qualify for an immigrant visa through such programs as the diversity visa and special immigrant visa programs follow a similar application, screening, adjudication, and admission process.

### FACTUAL ALLEGATIONS

#### *Defendant Trump's January 27, 2017 Executive Order*

49.     On January 20, 2017, Defendant Trump was inaugurated as the forty-fifth President of the United States.

50.     One week later, on January 27, Defendant Trump signed EO1. Claiming a need to "protect Americans" from the threat of terrorism and blaming DOS policy for the September 11,

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    11

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

2001 tragedies (Sections 1 and 2), EO1 orders the immediate implementation of major changes to the ability of foreign nationals to seek and obtain admission to the United States. It impacts all major categories of foreign nationals who seek admission to the United States: immigrants, nonimmigrants, and refugees. Among its provisions, EO1 directs federal agencies to develop screening standards for all immigration benefits to identify individuals who enter fraudulently intending to cause harm (Section 4); suspends refugee processing for 120 days, halts the processing and admission of Syrian refugees indefinitely, and reduces the number of refugee admissions from 110,000 to 50,000 in fiscal year 2017 (Section 5); orders the heads of executive departments to consider rescinding their exercise of discretionary authority to waive inadmissibility under 8 U.S.C. § 1182(a)(3) (Section 6); directs agencies to expedite the completion and implementation of a biometric entry-exit system which includes reporting requirements (Section 7); and suspends DOS's authority to waive visa interviews unless a person is subject to a specific statutory exemption (Section 8).

51.     Sections 3(a) and (b), entitled "Suspension of Issuance of Visas and Other Immigration Benefits to Nationals of Countries of Particular Concern," order DHS, in consultation with DOS and the Director of National Intelligence (DNI), to review and submit a report to the President on "the information needed from any country to adjudicate any visa, admission, or other benefit under the INA (adjudications)" to verify an applicant's identity and assess her threat to security or public safety.

52.     In Section 3(c), the President, pursuant to 8 U.S.C. 1182(f), bans all persons from countries referred to in 8 U.S.C. § 1187(a)(12) from entering the United States on an immigrant

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                          12

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

or nonimmigrant visa for 90 days, with limited exceptions not relevant here. These countries are Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen.

53.     Sections 3(d)-(f) set forth a timetable for identifying countries that do not supply the information on foreign nationals included in the DHS report to the President and requesting their compliance. For those that fail to comply, the President may impose a ban on the entry of nationals of that country until such time as the country complies. At any time, DOS or DHS may suggest that the President impose similar treatment on additional countries.

### *Resulting Chaos*

54.     Immediately following issuance of EO1, hundreds of persons involved in the immigrant visa process were harmed. Plaintiffs A.F.A., G.E., Seyedehfatemeh Hamedani, Faduma Olad Issa, F.O.I., and S.O.I., along with an untold number of others, already had applied for visas; they faced the immediate suspension of the adjudication of their immigrant visa applications. Many others had been issued a visa and were en route or making plans to travel to the United States, and suddenly found themselves banned from entering the United States notwithstanding their valid visas.

55.     The DOS and some U.S. embassies and consulates abroad immediately posted notices advising immigrant visa applicants that visa issuance had been suspended and visa interviews cancelled. The notices further advised that foreign nationals from the targeted countries should not schedule visa appointments, pay visa fees, or attend scheduled visa interviews; in fact, the notices indicated that individuals who showed up for scheduled visa interviews would not be permitted entry into the U.S. embassy or consulate. On January 27, 2017, DOS Deputy Assistant Secretary, Bureau of Consular Affairs, issued a cable stating that, upon the request of DHS and

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    13

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

pursuant to EO1 and INA §§ 212(f) and 221(i) (8 U.S.C. §§ 1182(f) and 1201(i)), he was revoking all valid immigrant and nonimmigrant visas of nationals of the seven targeted countries, with limited exceptions. Upon information and belief, DOS provisionally revoked approximately 60,000 visas in the period immediately following EO1.

56.    An untold number of individuals who had already received valid visas were left unable to travel. Many others with valid visas had booked travel to the United States and were stopped in transit. Still others were refused entry into the United States and forced to return.

57.    On February 3, 2017, the District Court for the Western District of Washington issued a temporary restraining (TRO) order in *Washington v. Trump*, enjoining sections 3(c), 5(a), 5(b), 5(c), and 5(e) of EO1. *See* No. 2:17-cv-00141-JLR, 2017 U.S. Dist. LEXIS 16012 (W.D. Wash. Feb. 3, 2017). On February 4, 2017, the government appealed the injunction to the Ninth Circuit and moved to stay this Court's order, which the Ninth Circuit denied. *See Washington v. Trump*, Case No. 17-35105 (9th Cir.).

58.    Following issuance of the TRO, DOS announced that it had lifted the provisional revocation of visas of nationals from the seven countries, and that those visas were valid for travel to the United States if the individual was otherwise eligible. Notably, DOS stated that individuals whose visas had expired in the interim would have to reapply for new visas or seek extraordinary discretionary relief from CBP to enter the United States.

### *Defendant Trump Repeatedly Delays Issuing a New Executive Order Despite Claims of Urgency*

59.    In defense of the chaotic roll-out of EO1 and its call for an *immediate* ban on entry and suspension of immigration visa adjudications, Defendant Trump and those working closely with

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    14

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

him repeatedly stressed the urgency of the risk to the security of the United States. *See, e.g.*, Donald Trump (@realDonaldTrump), Twitter (Jan. 30, 2017, 08:31 AM) https://twitter.com/realDonaldTrump/status/826060143825666051 ("If the ban were announced with a one week notice, the 'bad' would rush into our country during that week. A lot of bad 'dudes' out there!"); Riley Beggin, *Protesters Caused "Only Disruption" Surrounding Immigration Order: White House Advisor*, ABC NEWS (Feb. 2, 2017) (providing statement of Stephen Miller that "[i]f you believe as we do that the next Trojan horse is just waiting to come in, then you have an obligation to act quickly and expeditiously"). Subsequent to the temporary restraining order issued in *Washington*, Defendant Trump stated that "many bad and dangerous people may be pouring into our country" because of this Court's "terrible decision." Donald Trump (@realDonaldTrump), Twitter (Feb. 4, 2017, 04:44 PM) https://twitter.com/realDonaldTrump/status/ 827996357252243456; *see also* Full transcript: President Donald Trump's news conference, CNN (Feb. 16, 2017) (explaining that decision to make EO1 effective immediately was to prevent "bad people" from having time to come in).

60.     Despite this purported urgency, however, Defendant Kelly testified before Congress that he should have delayed the roll-out of EO1 in order to discuss the plan with members of Congress and with the leadership of relevant Congressional committees "to prepare them for what was coming." Matt Zapotosky, *John Kelly testifies travel ban should have been delayed*, BOSTON GLOBE (Feb. 7, 2017).

61.     Moreover, despite continued claims of urgency, Defendant Trump delayed issuance of EO2 for weeks. *See, e.g.*, Julia Carrie Wong, *Trump to sign new immigration policy after multiple court defeats of travel ban*, GUARDIAN (February 16, 2017); Jennifer Jacobs, *Trump*

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    15

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

*Delaying Revamped Immigration Order Until Next Week, Official Says*, BLOOMBERG (Feb. 22, 2017); Laura Jarrett et al., *Trump delays new travel ban after well-reviewed speech*, CNN (Mar. 1, 2017). Reportedly, some of the delay was motivated by a desire to prolong favorable press coverage of a speech made by Defendant Trump to Congress. *Id.*

### *Defendant Trump's March 6, 2017 Executive Order*

62.     On March 6, 2017, Defendant Trump issued EO2, which has the same discriminatory effect and motive as EO1. Whereas EO1 banned entry from seven countries, EO2 omits Iraq from this list, but continues to suspend visa adjudications and issuance and continues to ban entry of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen. Thus, although Section 13 of EO2 technically revokes EO1 as of March 16, 2017, the unlawful effect of EO1 is extended and continued in EO2.

63.     Section 1(a), entitled "Policy and Purpose," states that it is the policy of the United States to protect its citizens from terrorist attacks and to improve the screening and vetting protocols and procedures associated with the visa-issuance process. Section 1(e) quotes from DOS Country Reports on Terrorism 2015 regarding each of the six countries now included in the ban. Following these summaries, Section 1(f) states that a ban on entry is necessary because the "risk of erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts or otherwise harm the national security of the United States is unacceptably high."

64.     Section 1(h) declares that "recent history shows" that individuals have previously entered the United States who were threats to national security, and alludes to "hundreds of people who were *born abroad* who have been convicted of terrorism-related crimes in the United States since 2001." (emphasis added). EO2 provides no evidence in support of this statement; does not define

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    16

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

what constitute "terrorism-related crimes;" and significantly, does not indicate whether any such crimes were committed by nationals of the six countries included in EO2.

65.     In fact, it identifies only one such case—that of a Somalian who entered the United States as a refugee when a child. *Id.* On information and belief, this is a reference to the case of Mohamed Osman Mohamud, who entered the United States as a five-year-old refugee in 1996, subsequently became a U.S. citizen, and at age nineteen was arrested for the crime in question. Lynne Terry, *Family of Portland's bomb suspect, Mohamed Mohamud, fled chaos in Somalia for new life in America*, THE OREGONIAN (Dec. 4, 2010). EO2 does not clarify how heightened visa screening might detect and prevent the future radicalization of a five-year-old.

66.     Section 2(a) through 2(g) set out a multi-step process for review of, and determinations about, the information-sharing protocols that Defendants will require of the six countries in order to lift the suspension.

67.     Section 2(c) contains the ban on entry that continues that found in Section 3(c) in EO1. Specifically, Defendant Trump proclaims pursuant to 8 U.S.C. §§ 1182(f) and 1185(a), that the unrestricted entry into the United States of nationals of the six targeted countries "would be detrimental to the interests of the United States." The entry of such nationals is again suspended for 90 days, starting on March 16, 2017.

68.     EO2 purports to adopt this ban to "to temporarily reduce investigative burdens on relevant agencies" during review of the information-sharing protocols of each of the targeted countries; "to ensure the proper review and maximum utilization of available resources for the screening and vetting of foreign nationals;" and "to ensure that adequate standards are

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    17

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

established to prevent infiltration by foreign terrorists… in light of the national security concerns" with respect to each of the targeted countries.

69.    Additional guidance provided by Defendant DHS indicates that the ban contained in Section 2(c) applies "to both nationals and citizens of the six countries." *Q&A: Protecting the Nation From Foreign Terrorist Entry Into The United States*, Dep't of Homeland Sec. (Mar. 6, 2017).

70.    Section 3(a) specifies that the ban applies to nationals of the designated countries who are outside the United States on the effective date of this order; did not have a valid visa at 5:00 p.m., eastern standard time on January 27, 2017; and do not have a valid visa on the effective date of this order. Section 3(b) contains limited exceptions to this, none of which are applicable to the adjudication of immigrant visas.

71.    Section 3(c) provides a list of potential grounds for individual waivers of the suspension of adjudications and entry. This waiver process is entirely discretionary, and the burden is placed on visa applicants to "demonstrate[] to the officer's satisfaction" that: denying entry during the suspension period would cause undue hardship;" the foreign national's "entry would not pose a threat to national security;" and such entry "would be in the national interest." For immigrant visa applicants who fall within the scope of the ban, § 3(a), no visa will be issued without a waiver being granted. *See* §§ 2(c) and (3).

72.    Section 3(c) identifies nine situations in which a discretionary case-by-case waiver "could be appropriate." Those relevant to foreign nationals applying for an immigrant visa include cases in which the foreign national: demonstrates that undue hardship would be caused if prevented from visiting or residing with U.S. citizen or lawfully residing noncitizen family

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                18

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

members in the United States; has previously studied or worked in the United States; has significant ties to the United States; has significant business or professional interests here; is an infant, young child, adoptee, or person with urgent medical needs; is a former employee of the U.S. government; or is a landed Canadian immigrant applying for a visa from within Canada.

73.     Section 3(c) provides no guidance on how the waiver process will be implemented, nor does it indicate how a visa applicant might meet the burden of proving he or she is not a threat to national security in light of the purported difficulty that Defendants have in making exactly such determinations with respect to nationals of the targeted countries.

### EO2 Is Not a "Temporary Suspension"

74.     Sections 2(a), (b), and (d) through (f) of EO2 make clear that the initial 90-day suspension period will not be lifted automatically for any of the targeted countries. Instead, these sections provide a complex, multi-step process for determining what additional information-sharing each country must adopt in order for the ban to be lifted. These steps include an initial review of the existing information-sharing capabilities of each country; a determination of the additional information each country will need to share to satisfy Defendants that visa applicants from that country do not present a safety threat, which may vary by country; a report to the President on these determinations; negotiations with each country to obtain the additional information that is to be required; recommendations to the President about what countries should be subject to a continued entry ban based upon the outcome of the negotiations; and a proclamation from the President regarding the countries to be subject to a continued ban on entry of all or categories of its population who seek visas to the United States.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    19

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

75.     Specifically, in Section 2(d), the Secretary of State is instructed to request that "all foreign governments that do not supply [information described in Section 2(a)] regarding their nationals" begin providing such information within 50 days. After 50 days, Section 2(e) directs the Secretary of State, the Secretary of Homeland Security, and the Attorney General to "submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals of countries that have not provided" the information described in section 2(a). This new proclamation would be indefinite, continuing "until [the countries provide the information] or until the Secretary of Homeland Security certifies that the country has an adequate plan to do so, or has adequately shared information through other means."

76.     The Islamic Republic of Iran has not had any formal diplomatic relations with the United States since April 1980. Following EO1, the Iranian government issued a reciprocal travel ban on American citizens, and continued this ban following EO2. *Iran keeps ban on US visitors in response to Trump order*, YAHOO.COM, Mar. 7, 2017, https://www.yahoo.com/news/iran-keeps-ban-us-visitors-response-trump-order-104300662.html. Iranian nationals and citizens wishing to immigrate to the United States undergo the full panoply of visa screening and adjudication in one of three U.S. embassies in Armenia, Turkey, or the United Arab Emirates. In the 37 years since the United States severed diplomatic ties with Iran and implemented visa processing outside of Iran, no American has been killed by an Iranian national in the United States as a result of any planned or actual terrorism-related act. Upon information and belief, negotiations over information sharing with the government of Iran will prolong indefinitely the period in which the ban is imposed on nationals of that country.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    20

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

1

2

3

4   77.     Although the United States maintains formal relations with the Government of National

5   Accord of Libya, this government does not control the majority of territory in Libya, and the

6   United States has not had an embassy in Libya since July 26, 2014. U.S. Dep't of State, Libya

7   Travel Warning, TRAVEL.STATE.GOV (Jan 27, 2017). Libyan nationals and citizens wishing

8   to immigrate to the United States currently undergo full panoply of visa screening and

9   adjudication in the U.S. embassy in Rabat, Morocco. In the three years since closing the U.S.

10  Embassy in Libya, no Libyan national has been convicted of any planned or actual terrorism-

11  related violent act in the United States. Upon information and belief, negotiations over

12  information sharing with the government of Libya will prolong indefinitely the period in which

13  the ban is imposed on nationals of that country.

14  78.     Although the United States recently reestablished formal diplomatic relations with

15  Somalia, it has not had an embassy in Somalia in over twenty years. Bureau of African Affairs,

16  U.S. Dep't of State, U.S. Relations with Somalia (2016). The current Somali government does

17  not control the entire land mass of Somalia. Roughly 20 percent of Somalia is under the control

18  of the self-declared Republic of Somaliland, which has no formal relations with the United States.

19  Additionally, a large percentage of Somali nationals reside outside Somalia in neighboring

20  countries. Somalia nationals and citizens wishing to immigrate to the United States currently

21  undergo the full panoply of visa screenings and adjudication at the U.S. embassy in Nairobi,

22  Kenya, or at another U.S. Embassy outside of Somalia. In more than two decades since the

23  United States closed its embassy in Somalia, only a single Somali individual, Mohamed Osman

24  Mohamud, *see supra at ¶65*, has been convicted of any planned or actual terrorism-related

25  violent act in the United States, and no American has been killed by a Somalia national in the

26

27  AMENDED COMPLAINT—CLASS ACTION FOR                    Northwest Immigrant Rights Project
    DECLARATORY AND INJUNCTIVE RELIEF                     615 Second Ave., Ste. 400
28  Case No. 2:17-cv-135-JLR              21                Seattle, WA 98104
                                                            206-957-8611

United States as a result of any planned or actual terrorism-related act. Upon information and belief, negotiations over information sharing with the government of Somalia will prolong indefinitely the period in which the ban is imposed on nationals of that country.

79.     Although the United States has not appointed an ambassador to Sudan since 2014, the United States maintains formal diplomatic relations with Sudan and currently maintains an embassy in the capital city of Khartoum. Bureau of African Affairs, US Dep't of State, U.S. Relations with Sudan (2015). Due to ongoing and widescale human rights violations on the part of the government of Sudan, the United States has a contentious relationship with the Sudanese government and in recent years has formally sanctioned the Sudanese government twice. *Id.* Sudanese nationals and citizens wishing to immigrate to the United States currently undergo the full panoply of visa screenings and adjudication in the U.S. embassy in Khartoum. No American has ever been killed by a Sudanese national in the United States as a result of any planned or actual terrorism-related act. Upon information and belief, negotiations over information sharing with the government of Sudan will prolong indefinitely the period in which the ban is imposed on nationals of that country.

80.     The Syrian Arab Republic currently does not have any formal diplomatic relations with the United States, following action taken by DOS to expel the Syrian embassy and consular presence from the United States as of March 31, 2014. Bureau of Near Eastern Affairs, US Dep't of State, U.S. Relations with Syria (2014). Syrian nationals and citizens wishing to immigrate to the United States currently undergo the full panoply of visa screening and adjudication in the U.S. embassy in Amman, Jordan. In the three years since the United States severed diplomatic ties with Syria, no Syrian national has been convicted of any planned or actual terrorism-related

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    22

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

violent act in the United States. Upon information and belief, negotiations over information sharing with the government of Syria will prolong indefinitely the period in which the ban is imposed on nationals of that country.

81.     Although the United States maintains formal diplomatic relations with Yemen, it has not had an embassy in Yemen since February 2015. Bureau of Near Eastern Affairs, US Dep't of State, U.S. Relations with Yemen (2017). The Yemeni government currently does not have control of the capitol of Yemen. *Id*. Yemeni nationals and citizens wishing to immigrate to the United States currently undergo visa processing at the U.S. Embassy in Djibouti, Djibouti. In the two years since the United States closed its embassy in Yemen, no Yemeni individual has been convicted of any planned or actual terrorism-related violent act in the United States. Upon information and belief, negotiations over information sharing with the government of Yemen will prolong indefinitely the period in which the ban is imposed on nationals of that country.

82.     EO2's stated reasons for excluding Iraq indicate the lengths to which a country must go to be removed from the travel ban. Section 1(g) of EO2 states that "Iraq is a special case," because of the "close cooperative relationship between the United States and the democratically elected Iraqi government, the strong United States diplomatic presence in Iraq, the significant presence of the United States forces in Iraq, and Iraq's commitment to combat ISIS." All of these rationales existed prior to EO1. The only post-EO1 justification for excluding Iraq from the EO2 target list is the assertion that, in the roughly five week period between the two EOs, the Iraqi government "has expressly undertaken steps to enhance travel documentation, information sharing, and the return of Iraqi nationals subject to final orders of removal."

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                  23

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

83.     Upon information and belief, none of the six countries currently included in EO2 meet the factors which it identified as determinative in Defendant Trump's the decision to remove Iraq from the ban. EO2, § 1(g); *see also* State Department Dissent Memo, *supra* ("In some cases, the governments of these countries may be wholly incapable of providing this information; in others, the government may be unwilling."). Under the provisions of EO2, nationals of any country which is unwilling or unable to provide the information described in Section 2(b) will be barred indefinitely from entry to the United States.

### Defendants Intended EO2 to Achieve Substantially the Same Result as EO1.

84.     The purpose of EO2 is to give effect to the actions proscribed in EO1 in a manner that will best shield those actions from the legal challenges EO1 has endured. For example, Defendant Trump has stated: "The new order is going to be very much tailored to what I consider a very, very bad decision … We can tailor the order to the decision to get just as much." Jennifer Jacobs, *Trump Delaying Revamped Immigration Order Until Next Week, Official Says*, Bloomberg (Feb. 22, 2017).

85.     EO2 operates directly in conjunction with EO1 in an effort to achieve the same result but is more artfully drafted in an attempt to withstand judicial scrutiny. This is made further apparent by the fact that EO2 does not purport to revoke EO1 until the effective date of EO2, March 16, 2016.

86.     White House Senior Policy Advisor Stephen Miller explained that the revisions in EO2 are intended to address only "very technical issues" and achieve "the same basic policy outcome" as EO2. *Trump adviser says new travel ban will have "same basic policy outcome,"* (Feb. 21, 2017) interview clip at 3:16-3:51, available

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    24

Northwest Immigrant Rights Project
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

at http://www.foxnews.com/politics/2017/02/21/trump-adviser-says-new-travel-ban-will-have-same-basic-policy-outcome.html.

### *Animus Directing Defendant Trump's Executive Orders Banning Immigration*

87.     Through repeated statements, Defendant Trump has demonstrated his intent to target the admission of foreign nationals based upon their practice of Islam and because of his animus against Muslims. As a candidate, Defendant Trump championed an explicit Muslim ban, "calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on." Donald J. Trump, Donald J. Trump Statement On Preventing Muslim Immigration (Dec. 7, 2015), https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration. When interviewed the next day about how the "shutdown" would work for a Muslim immigrant arriving at a port of entry, Defendant Trump offered the suggestion that, "[T]hey [customs officials] would say, are you Muslim?" Defendant Trump then confirmed that if the person admitted to being Muslim, they would not be allowed to enter. Nick Gass, *Trump not bothered by comparisons to Hitler, Politico* (Dec. 8, 2015).

88.     When British citizens responded to the proposed Muslim ban with a record-breaking petition to block Defendant Trump from entering the United Kingdom, *see* Issie Lapowsky, *Online Petition to Ban Trump Is Now the UK's Most Popular*, WIRED (Dec. 10, 2015), Donald Trump responded by tweeting repeatedly about the United Kingdom's "massive Muslim problem." *See, e.g.*, Donald Trump (@realDonaldTrump), Twitter (Dec. 10, 2015, 07:49 AM), https://twitter.com/realdonaldtrump/status/674934005725331456.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                                    25

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

89.     When asked whether he believed that "Islam is at war with the U.S.," Defendant Trump responded "I think Islam hates us. … There's an unbelievable hatred of us… There is a tremendous hatred and we have to be very vigilant and we have to be very careful and we can't allow people coming into this country who have this hatred of the United States and of people who are not Muslim." Theodore Schleifer, *Donald Trump: "I think Islam hates us,"* CNN (Mar. 10, 2016). Soon after, Defendant Trump asserted that there was "no way" he would allow Muslims to "flow in" to the United States. Donald Trump (@realDonaldTrump), Twitter (Mar 22, 2016, 09:59 PM), https://twitter.com/realdonaldtrump/status/712473816614772736 ("Incompetent Hillary, despite the horrible attack in Brussels today, wants borders to be weak and open-and let the Muslims flow in. No way!").

90.     Subsequently, Defendant Trump linked a proposed nationality-based immigration ban to Islam by claiming that "[w]e are importing Radical Islamic Terrorism into the West through a failed immigration system." Donald J. Trump Addresses Terrorism, Immigration, and National Security, Donald Trump Campaign (June 13, 2016). In the same speech, he singled immigration of Muslims as a key problem faced by the United States: "Each year the United States permanently admits 100,000 immigrants from the Middle East and many more from Muslim countries outside of the Middle East. Our government has been admitting ever-growing numbers, year after year, without any effective plan for our own security." *Id.* He later declared that "[o]ur way of life is under threat by Radical Islam." (@realDonaldTrump), Twitter (July 25, 2016, 10:50 PM), https://twitter.com/realdonaldtrump/status/758872422028148740.

91.     Members of the White House staff who were responsible for drafting EO1 include White House Senior Policy Director Stephen Miller and White House Chief Strategist Stephen Bannon,

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                          26

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

both of whom are close advisors to Defendant Trump. *Bannon Driving Force Behind Trump's Hardline Immigration Ban, Officials Say*, NEWSWEEK, Jan. 30, 2017, *available at* http://www.newsweek.com/donald-trump-steve-bannon-immigration-ban-immigration-muslim-550415. Both have publicly voiced animus against Muslims. Stephen Miller founded an organization called the "Terrorism Awareness Project," wrote that America was in a "war against the Islamic jihad" and "its religion of terror," and urged students to "mobilize support for the defense of America and the civilization of the West." Andrew Kaczynski and Chris Massie, *In college, Trump aide Stephen Miller led controversial 'Terrorism Awareness Project' warning of 'Islamofascism,'* CNN (Feb. 15, 2017). Stephen Bannon stated in 2014 that "we are in an outright war against jihadist Islamic fascism," and urged Catholics to recall "the long history of the Judeo-Christian West struggle against Islam." Scott Shane, *Stephen Bannon in 2014: We Are at War With Radical Islam*, NY Times (Feb. 1, 2017).

92.      When Defendant Trump signed EO1, he stated that he was "establishing new vetting measures to keep radical Islamic terrorists out." Dan Merica, Trump signs executive order to keep out "radical Islamic terrorists," CNN (Jan. 30, 2017).

93.      Two days after EO1 was signed, Rudolph Giuliani, Defendant Trump's advisor on cybersecurity, confirmed that it was intended to be a "legal" ban on Muslims. *See* Amy B. Wang, Trump asked for a "Muslim ban," Giuliani says—and ordered a commission to do it "legally," Wash. Post (Jan. 29, 2017) ("So when [Trump] first announced it, he said, 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.'"). Mr. Giuliani's admission is supported by Defendant Trump's own explanation of EO1: "People were so upset when I used the word Muslim. Oh, you can't use the word 'Muslim.' Remember

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    27

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

this. And I'm okay with that, because I'm talking territory instead of Muslim." *Rebecca Shabad*,

*Donald Trump says he's expanding his Muslim ban*, CBS News (July 25, 2016).

94.    Following the Department of Justice's appeal to the Ninth Circuit in *Washington*,

Defendant Trump stated on Twitter that "Courts must act fast" because "[t]he threat from radical

Islamic terrorism is very real." Donald Trump (@realDonaldTrump), Twitter (Feb 6, 2017, 09:49

PM), https://twitter.com/realdonaldtrump/status/828797801630937089.

95.    More than three weeks after signing EO1, Defendant Trump continued to link it to Islam:

"I've taken decisive action to keep radical Islamic terrorist[s] the hell out of our country."

President Donald Trump, Remarks at Rally in Melbourne, Florida (Feb 18, 2017), *available at*

http://pbpo.st/2kLCMfr.

96.    The text of EO1 further demonstrated its bias against Muslims by singling out refugee

claims by individuals who are religious minorities in their countries of origin. EO1, § 5(b); *see*

*also* Michael D. Shear & Helene Cooper, *Trump Bars Refugees and Citizens of 7 Muslim*

*Countries*, NY Times (Jan. 27, 2017) ("[President Trump] ordered that Christians and others

from minority religions be granted priority over Muslims."). On the same day EO1 was signed,

President Trump agreed that the changes to the refugee programs were made to give priority to

Christians, falsely stating that "If you were a Muslim you could come in [as a refugee], but if you

were a Christian, it was almost impossible." David Brody, Brody File Exclusive: President

Trump Says Persecuted Christians Will Be Given Priority As Refugees (Jan 27, 2017). Two days

later, Defendant Trump tweeted that "Christians in the Middle-East have been executed in large

numbers. We cannot allow this horror to continue!" Donald Trump (@realDonaldTrump),

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    28

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

Twitter (Jan 29, 2017, 07:04 AM)

https://twitter.com/realDonaldTrump/status/825721153142521858.

97.     EO2 is, in relevant substantive part, a nearly-identical continuation of EO1; both were

intended to mark Muslims for disfavored treatment. No country with a different religious

majority, regardless of political instability or lack of cooperation with the U.S. government, is

similarly targeted. For example, the United States does not have diplomatic relations with

Bhutan and North Korea and engages in no information-sharing with those governments. US

Dep't of State, Bureau of Consular Affairs, *Countries with Limited or No Visa Services*,

travel.state.gov (Accessed Mar 10, 2017),

https://travel.state.gov/content/visas/en/general/countries-with-limited-or-no-u-s--visa-

services.html.

98.     The principal effect of EO2 is to inhibit religion. By singling out and barring visa

issuance for applicants from six predominantly Muslim nations, EO2's operation will have the

intended effect of limiting the ability of Muslims to immigrate to the United States and further

stigmatizing Islam as disfavored by the U.S. government. Such stigma will not only harm

Plaintiffs and proposed class members, but likely will harm Muslims living in the U.S., and

potential immigrants abroad discouraged from seeking admission.

### *Leading National Security and Foreign Policy Experts Condemn the EO*

99.     Leading national security experts, including former Secretary of State John Kerry,

criticized EO1 as unmoored from legitimate national security claims. *See* Joint Declaration of

Madeleine K. Albright, *et al.* at 2, *Washington*, No. 17-35105 (9th Cir. 2017), ECF 28-2. Four of

the declarants were officials who "were current on active intelligence regarding all credible

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                   29

Northwest Immigrant Rights Project
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

terrorist threat streams directed against the U.S. as recently as one week before the issuance of [EO1]." *Id.* at ¶ 2. They were "unaware of any specific threat that would justify the travel ban," and stated that "in our professional opinion, this Order cannot be justified on national security or foreign policy grounds." *Id.* at ¶ 3. They further concluded that "[t]here is no national security purpose for a total bar on entry for aliens from seven named countries." *Id.* at ¶ 4.

100.    Additionally, more than 1,000 State Department employees signed a dissent cable in opposition to EO1, stating that it "will have little practical effect in improving public safety," and that "[t]he end result of this ban will not be a drop in terror attacks in the United States; rather, it will be a drop in international good will towards Americans and a threat towards our economy." Jeffrey Gettleman, *State Dept. Dissent Cable on Trump's Ban Draws 1,000 Signatures*, NY Times (Jan. 31, 2017), *available at* https://www.nytimes.com/2017/01/31/world/americas/state-dept-dissent-cable-trump-immigration-order.html.

101.    A draft of Defendant DHS's own post-hoc review challenged Defendant Trump's "core claims" behind EO1—that there was an increased risk of terror-related incidents from foreign nationals coming to the United States from the targeted countries—and concluded that the ban was ineffective. See Salama & Caldwell, AP Exclusive: DHS report disputes threat from banned nations, Assoc. Press (Feb. 24, 2017), *available at* http://apne.ws/2ldKZtf (noting that "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity").

102.    A report published subsequent to EO1 by Defendant DHS's Office of Intelligence and Analysis further undercut the basis for the sweeping EO, indicating that the clear majority of foreign-born individuals arrested for terrorism charges in the United States were not radicalized at the time they immigrated to the United States. DHS Office of Intelligence and Analysis, Most

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                         30

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

Foreign-born, US-based Violent Extremists Radicalized after Entering Homeland (Mar. 1, 2017), *available at* http://www.msnbc.com/rachel-maddow-show/trms-exclusive-dhs-document-undermines-trump-case-travel-ban.

103.    Other statistics confirm these conclusions. No American citizen has ever been killed in a terrorist attack in the United States by an individual from one of the six countries included in EO2. Alex Nowrasteh, Little National Security Benefit to Trump's Executive order on Immigration, CATO (Jan. 25, 2017).

104.    EO2 is subject to the same critiques as EO1. It continues the complete suspension of visa issuance and the ban on entry for all foreign nationals of the six targeted countries who do not have a visa in hand on March.

105.    Secretary of Homeland Security John Kelly acknowledged on March 6, 2017, that there are other countries with questionable vetting procedures that are not on the list and likely will not be put on the list; "There's a number of them out there, I don't want to speculate. There's probably 13 or 14 countries, not all of them Muslim countries, not all of them in the Middle East, that have questionable vetting procedures we can rely on." Daniella Diaz, Kelly: There are '13 or 14' more countries with questionable vetting procedures, CNN (Mar. 7, 2017).

## PLAINTIFFS' ALLEGATIONS

### *Plaintiffs Juweiya Abdiaziz Ali and her son A.F.A.*

106.    Plaintiff Juweiya Abdiaziz Ali is a 23-year-old U.S. citizen who resides in Seattle, Washington.

107.    Ms. Ali was born in Somalia and came to the United States as a child.

AMENDED COMPLAINT—CLASS ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR            31

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

108.    She derived U.S. citizenship on August 31, 2010 when her mother became a U.S. citizen.

109.    On August 12, 2016, Ms. Ali filed a family-based immigrant visa petition (Form I-130) for her son, Plaintiff A.F.A., with USCIS, along with the then requisite $420.00 filing fee.

110.    A.F.A. is a 7-year-old citizen and resident of Somalia, where he lives with his grandmother.

111.    On December 21, 2016, USCIS approved the immigrant visa petition Ms. Ali filed on behalf of A.F.A. and his case was subsequently transferred to the NVC for the processing of an immigrant visa as a child of a U.S. citizen (IR-2).

112.    On January 17, 2017, the NVC processed Ms. Ali's payment of the requisite $325 processing fee for the Immigrant Visa Application, along with the requisite $120 processing fee for the Affidavit of Support.

113.    On January 20, 2017, Ms. Ali electronically submitted A.F.A.'s immigrant visa application (Form DS-260). Also on that date, she mailed all supporting documents and Request for Exemption for Intending Immigrant's Affidavit of Support (Form I-864W) to the NVC.

114.    The United States does not have an embassy or mission that processes immigrant visas in Somalia. The U.S. embassy in Nairobi, Kenya can process and issue immigrant visas for Somalian nationals.

115.    Ms. Ali and A.F.A. are currently waiting for the U.S. embassy in Nairobi to schedule an immigrant visa interview.

116.    Pursuant to Section 3(c) of EO1, Defendants suspended the adjudication of A.F.A.'s immigrant visa application.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                     32

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

117.     Pursuant to Section 2 of EO2, Ms. Ali and A.F.A. again face indefinite separation as A.F.A.'s immigrant visa application adjudication will *again* be suspended, creating, at a minimum, irreparable harm by further delay and separation, with a very real possibility that the United States will not permit A.F.A. to ever enter the United States to join his mother, Ms. Ali.

### *Plaintiffs Reema Khaled Dahman and her son G.E.*

118.     Plaintiff Reema Khaled Dahman is a 41-year-old U.S. lawful permanent resident ("LPR") who lives in Kent, Washington.

119.     She is a Syrian citizen who became an LPR on September 18, 2012.

120.     On October 19, 2015, Ms. Dahman filed a family-based immigrant visa petition (Form I-130) on behalf of her son, Plaintiff G.E., with USCIS, along with the then requisite $420.00 filing fee.

121.     G.E. is a 16-year-old citizen and resident of Syria, where he lives with his grandmother.

122.     G.E. and his mother have not seen each other since 2012.

123.     On June 1, 2016, USCIS approved the I-130 petition Ms. Dahman filed on behalf of G.E.

124.     USCIS subsequently transferred his case to the NVC for the processing of an immigrant visa as a minor son of an LPR.

125.     On September 22, 2016, the NVC processed Ms. Dahaman's payment of the requisite $325 processing fee for the Immigrant Visa Application, along with the requisite $120 processing fee for the Affidavit of Support.

126.     On December 2, 2016, Ms. Dahman electronically submitted G.E.'s immigrant visa application (Form DS-260). Also on that date, Ms. Dahman e-mailed the NVC all civil documents and her Affidavit of Support (Form I-864).

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    33

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

127.   The United States does not have an embassy or mission that processes immigrant visas in Syria. The U.S. embassy in Amman, Jordan processes and issues immigrant visas for Syrian nationals.

128.   Ms. Dahman and G.E. are currently waiting for the U.S. embassy in Amman to schedule an immigrant visa interview.

129.   The website of the U.S. embassy in Amman announced that it had suspended the processing of immigrant visas of Syrian nationals pursuant to Section 3(c) of EO1, *see* https://jo.usembassy.gov/special-information-for-syrian-applicants/ (last visited Jan. 30, 2017).

130.   Pursuant to Section 2 of EO2, Plaintiffs again face indefinite separation as G.E.'s immigrant visa application adjudication will be suspended, creating, at a minimum, irreparable harm by further delay and separation, with a very real possibility that the United States will not permit G.E. to ever enter the United States to join his mother, Ms. Dahman.

### *Plaintiffs Jaffer Akhlaq Hussain and his wife Seyedehfatemeh Hamedani*

131.   Plaintiff Jaffer Akhlaq Hussain is a 36-year-old lawful permanent resident of the United States who resides in Parlin, New Jersey. He is a software developer.

132.   Mr. Hussain was born in Pakistan, and came to the United States in 1999 as an F-1 student to attend the University of Wisconsin, where he received the degree of Bachelor of Science in Electrical Engineering. He continued his education at Northeastern University, where he received his master's degree. He was granted a change of status to H-1B on October 1, 2008. He was sponsored by his employer for permanent residence, and he became a permanent resident of the United States on October 2, 2013.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    34

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

133.    On April 14, 2015, Mr. Hussain filed with USCIS a family-based immigrant visa petition (Form I-130) for his wife, Seyedehfatemeh Hamedani, along with the filing fee of $420.00.

134.    Ms. Hamedani is a 31-year-old citizen and resident of Iran. She was born in Iran.

135.    On October 13, 2015, USCIS approved the I-130 petition, and the petition was subsequently transferred to the NVC for the adjudication of an immigrant visa as the spouse of a permanent resident (F2A).

136.    On January 20, 2016, the NVC processed Mr. Hussain's payment for the requisite $325 processing fee for the Immigrant Visa Application, along with the requisite $120 processing fee for the Affidavit of Support.

137.    On October 28, 2016, Mr. Hussain informed the NVC that his child E.S. had been born subsequent to the approval of the I-130 petition, and that the child should be added to the immigrant visa application as a derivative.

138.    On November 17, 2016, the NVC processed the additional $325 processing fee for the Immigrant Visa Application for E.S.

139.    On November 27, 2016, Ms. Hamedani electronically submitted her immigrant visa application (Form DS-260) to the NVC. On December 16, 2016 the DS-260 application was submitted on behalf of E.S.

140.    On January 27, 2017, all required civil documents and the Affidavit of Support were sent to the NVC, which received them on January 30, 2017.

141.    On February 1, 2017, the cutoff date for the F2A category advanced to April 15, 2015 for persons born in Iran, pursuant to the Visa Bulletin published monthly by DOS. The priority date for Ms. Hamedani's application is April 14, 2015. Therefore, under the family immigrant quota

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                                35

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

system, immigrant visas became immediately available to Ms. Hamedani and E.S. on and after February 1, 2017. Their priority date remains current as of the date of the filing of this complaint.

142.    On February 20, 2017, the NVC sent a letter stating that all required documentation for the immigrant visa case of Ms. Hamedani and E.S. had been received, and that the applications were now in the queue awaiting an interview appointment.

143.    The United States does not have an embassy or mission that processes immigrant visas in Iran. The immigrant visa case of Ms. Hamedani and E.S. has been assigned to the U.S. consulate in Abu Dhabi in the United Arab Emirates.

144.    Ms. Hamedani and E.S. are currently waiting for the U.S. consulate in Abu Dhabi to schedule an immigrant visa interview.

145.    Pursuant to Section 3(c) of EO1, Defendants suspended the adjudication of Ms. Hamedani and E.S.'s immigrant visa application.

146.    Pursuant to section 2(c) of EO2, Mr. Hussanin, Ms. Hamedani, and E.S. again face indefinite separation as Ms. Hamedani and E.S.'s immigrant visa adjudication will *again* be suspended, creating, at a minimum, irreparable harm by further delay and separation, with a very real possibility that the United States will not permit Ms. Hamidani and E.S. to ever enter the United States to join their husband and father, respectively.

### Plaintiffs Olad Issa Omar, his daughter Faduma Olad Issa, his minor daughter F.O.I., and his minor son S.O.I.

147.    Plaintiff Olad Issa Omar is a 46-year-old naturalized citizen of the United States who resides in Seattle, Washington. Mr. Omar was born in Somalia.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                      36

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

148.   On May 23, 2014, Plaintiff Omar filed with USCIS a family-based immigrant visa petition (Form I-130) for his three children, along with the filing fee of $420.00.

149.    Plaintiff Faduma Olad Issa is a 19-year-old citizen of Somalia and resident of Kenya. She was born in a refugee camp in Kenya.

150.   Plaintiff F.O.I. is a 17-year-old citizen of Somalia and resident of Kenya. She was born in a refugee camp in Kenya.

151.   Plaintiff S.O.I. is a 12-year-old citizen of Somalia and resident of Kenya. He was born in a refugee camp in Kenya.

152.   On July 27, 2014, USCIS approved the I-130 petition for all three of Plaintiff Omar's children, and they were transferred to the NVC for the adjudication of an immigrant visa as immediate relatives of Plaintiff Omar. Their visas became immediately available.

153.   On October 24, 2016, Plaintiffs Issa, F.O.I, and S.O.I, completed their medical examination, and all three were scheduled to attend an immigrant visa interview in Nairobi, Kenya in November 2016, but that interview was cancelled.

154.   Plaintiffs Issa, F.O.I, and S.O.I were then scheduled to return for an immigrant visa interview on March 20, 2017. On January 28, 2017, a day after EO1 was issued, Plaintiff Omar received an email cancelling his children's immigrant visa interview.

155.   After the Western District of Washington's injunction of EO1, Plaintiff Omar scheduled an immigrant visa interview for his children, for the third time.

156.   Plaintiffs Issa, F.O.I, and S.O.I are now scheduled to attend an immigrant visa interview on March 13, 2017.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                37

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

157.    On March 7, 2017, the U.S. consulate in Nairobi, Kenya sent an email to Plaintiff Omar informing him of EO2, signed the day before, without a clarification of the effect it has on his children's individual cases.

158.    Plaintiffs Issa, F.O.I, and S.O.I are currently planning to attend their interview on March 13, 2017 at the U.S. consulate in Nairobi.

159.    Pursuant to Section 3(c) of EO1, Defendants suspended the adjudication of Plaintiffs Issa, F.O.I, and S.O.I.'s immigrant visa applications.

160.    Pursuant to Section 2(c) of EO2, Plaintiff Omar and his children again face indefinite separation, as adjudication of the immigrant visa applications of Plaintiffs Issa, F.O.I, and S.O.I will again be suspended—creating, at a minimum, irreparable harm by further delay and separation, with a very real possibility that the United States will not permit Plaintiffs Issa, F.O.I, and S.O.I. to ever enter the United States to join their father.

## CLASS ALLEGATIONS

161.    Plaintiffs bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2). A class action is proper because this action involves questions of law and fact common to the class, the class is so numerous that joinder of all members is impractical, Plaintiffs' claims are typical of the claims of the class, Plaintiffs will fairly and adequately protect the interests of the class, and Defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole.

162.    In addition to Plaintiffs A.F.A., G.E., Seyedehfatemeh Hamedani, Faduma Olad Issa, F.O.I., and S.O.I., there are numerous other similarly situated immigrant visa applicants from

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                         38

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

Iran, Libya, Somalia, Sudan, Syria, and Yemen. Each of these individuals has had his or her immigrant visa application suspended due to the EOs.

163.     In addition to Plaintiffs Juweiya Ali, Reema Dahman, Olad Issa Omar, and Jaffer Akhlaq Hussain, there are numerous others who have petitioned for family members from Iran, , Libya, Somalia, Sudan, Syria, and Yemen. These similarly situated individuals or businesses are seeking to have the beneficiaries of their visa petitions travel to the United States, either to be reunited with family members or to join their workforce.

164.     Plaintiffs seek to represent a class consisting of:

> all nationals of countries designated by Section 2 of Executive Order 13780 (currently Iran, Libya, Syria, Somalia, Sudan, and Yemen), who have applied for or will apply for an immigrant visa and the visa petitioners for those nationals; whose visa application adjudication has been or will be suspended or denied, or who have been or will be denied the ability to seek entry into and/or enter the United States, on the basis of Executive Order 13780.

165.     Plaintiffs seek to represent the class and are adequate class representatives. All Plaintiffs have been subject to harm caused by the EOs in that these EOs have suspended their immigrant visa application adjudication. The Proposed Class is so numerous that joinder of all members is impracticable. The number of individuals who are subject to/affected by the EOs is not known with precision by Plaintiffs, but is easily ascertainable by Defendants, as will be addressed in Plaintiffs' Motion for Class Certification.

166.     Common questions of law and fact bind the members of the Proposed Class. These include, but are not limited to: whether the EOs violate the INA, the APA, and the U.S. Constitution.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    39

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

167.    The claims of the named Plaintiffs are typical of the claims of the Proposed Class as a whole. Defendants have subjected and will subject class members to the EOs absent relief by this Court.

168.    Plaintiffs know of no conflict between their interests and those of the Proposed Class. The members of the Proposed Class are ascertainable and identifiable through notice and discovery. In defending their own rights, the individual Plaintiffs will defend the rights of all class members fairly and adequately.

169.    Plaintiffs are represented in this case by counsel with deep knowledge of immigration law and extensive experience litigating class actions and complex cases. Plaintiffs' attorneys have the requisite level of expertise to adequately prosecute this case on their behalf and on behalf of the Proposed Class.

170.    Defendants have acted on grounds generally applicable to each member of the Proposed Class by subjecting Plaintiffs and class members to the EOs.

171.    A class action is superior to other methods available for the fair and efficient adjudication of this controversy because joinder of all members of the class is impracticable.

## CAUSES OF ACTION

### COUNT ONE
### Violation of the Immigration and Nationality Act

172.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    40

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

173.     Section 202(a)(1)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1152(a)(1)(A), expressly provides for the non-discriminatory issuance of immigrant visas; it mandates that, with limited exceptions not relevant here, "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence."

174.     Section 1152(a)(1)(A) was intended to protect the interests of both U.S. citizen and lawful permanent resident immigrant visa petitioners as well as immigrant visa applicants or holders.

175.     The EOs discriminate against immigrant visa applicants or holders on the basis of their "nationality, place of birth, or place of residence," and therefore are discriminatory and violate 8 U.S.C. § 1152(a)(1)(A).

**COUNT TWO**
**Violation of the Immigration and Nationality Act and the**
**Administrative Procedure Act**

176.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

177.     Defendants' suspension of the adjudication and issuance of Plaintiffs' immigrant visas, and/or invalidation or revocation of validly issued immigrant visas pursuant to either EO are discriminatory actions that violate 8 U.S.C. §§ 1152(a)(1)(A) and 1201(i).

178.     Defendants' actions in suspending the adjudication of Plaintiffs' immigrant visas, and/or invalidating or revoking already issued immigrant visas are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    41

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

statutory right; and without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A)-(D).

## COUNT THREE
### Mandamus, 28 U.S.C. § 1361

179.   Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

180.   8 U.S.C. § 1152(a)(1)(A) prohibits the government from denying issuance of immigrant visas "because of the person's race, sex, nationality, place of birth, or place of residence."

181.   Pursuant to the EOs, Defendants have suspended, and will suspend again, adjudications and issuance of and/or invalidated or revoked Plaintiffs' immigrant visas on the basis of their "nationality, place of birth, or place or residence."

182.   Defendants' unlawful adherence to the EOs—through their continuing refusal to adjudicate and issue immigrant visas or treat as valid existing immigrant visas—violates the government's clear, nondiscretionary obligation to adjudicate immigrant visa applications and issue immigrant visas in a non-discriminatory manner.

## COUNT FOUR
### Violation of Fifth Amendment –Equal Protection

183.   Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

184.   The Due Process Clause of the Fifth Amendment of the U.S. Constitution guarantees all individuals due process of the laws, which includes a guarantee of equal protection.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    42

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

185.    The EOs discriminate against Plaintiffs on the basis of their nationality and/or place of birth without sufficient justification, and therefore violate the equal protection component of the Due Process Clause of the Fifth Amendment.

186.    Additionally, the EOs were substantially motivated by animus toward—and have a disparate effect on—Muslims, which also violates the equal protection component of the Due Process Clause of the Fifth Amendment.

**COUNT FIVE**
**(Establishment Clause, First Amendment to the U.S. Constitution)**
**(Plaintiffs Juweiya Ali, Reema Dahman, Olad Issa Omar**
**and Jaffer Akhlaq Hussain Against All Defendants)**

187.    Plaintiffs Juweiya Ali, Reema Dahman, Olad Issa Omar  and Jaffer Akhlaq Hussain repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein

188.    The EOs violate the Establishment Clause by singling out Muslims for disfavored treatment and granting special preference to non-Muslims. They are neither justified by, nor closely fitted to, any compelling governmental interest. The EOs uniquely disfavor Muslims and burden Plaintiffs and proposed class members, based on religious bias, with discriminatory treatment, inability to enter the United States and stigma.

189.    The purpose of EOs is not secular and their principal effect is to inhibit religion. They were intended to mark Muslims for disfavored treatment. By singling out and barring visa issuance for applicants from six predominantly Muslim nations, EO2's operation will have the intended effect of limiting the ability of Muslims to immigrate to the United States and further stigmatizing Islam as disfavored by the U.S. government, harming Plaintiffs, proposed class

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                              43

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

members, Muslims living in the U.S., and potential immigrants abroad discouraged from seeking admission.

## COUNT SIX
### Violation of the Fifth Amendment – Due Process
### (Plaintiffs Juweiya Ali, Reema Dahman, Olad Issa Omar
### and Jaffer Akhlaq Hussain Against All Defendants)

190.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

191.    The Due Process Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person shall … be deprived of life, liberty, or property, without due process of law."

192.    Plaintiffs Juweiya Ali, Reema Dahman, and Olad Issa Omar and Jaffer Akhlaq Hussain have a constitutionally protected liberty interests in their family life.

193.    At a minimum, due process protects individuals against arbitrary government action, including actions that do not adhere to the constraints that Congress has imposed or the facts may dictate.

194.    Defendants' actions in suspending the adjudication of their immigrant visas taken pursuant to the EOs, violate the procedural due process rights guaranteed by the Fifth Amendment.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    44

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and other members of the proposed class respectfully pray that this Court grant the following relief:

a. Assume jurisdiction over this matter;

b. Certify the case as a class action as proposed herein;

c. Appoint Plaintiffs as representatives of the class;

d. Declare Section 3(c) of EO1 and Sections 1(f), 2 and 3 of EO2 to be contrary to the INA and the Constitution;

e. Issue an order enjoining and restraining Defendants from applying Sections 1(f), 2 and 3 of EO2 to Plaintiffs and proposed class members;

f. Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

g. Grant such further relief as the Court deems just, equitable, and appropriate.

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                    45

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611

1
2
3

Respectfully submitted this 10th of March, 2017, by:

4

5
s/*Matt Adams*                                     Mary Kenney, admitted *pro hac vice*
Matt Adams, WSBA No. 28287

6
s/*Glenda Aldana*                                  Aaron Reichlin-Melnick, admitted *pro hac vice*
7
Glenda M. Aldana Madrid, WSBA No. 46987

Melissa Crow, admitted *pro hac vice*
8
s/*Maria Lucia Chavez*
9
Maria Lucia Chavez, WSBA No. 43826         AMERICAN IMMIGRATION COUNCIL
1331 G Street, NW, Suite 200
10
NORTHWEST IMMIGRANT RIGHTS PROJECT          Washington, D.C. 20005
615 2nd Avenue, Suite 400 Seattle, WA       (202) 507-7512
11
98104 (206) 957-8611                        (202) 742-5619 (fax)
(206) 587-4025 (fax)
12

13
Trina Realmuto, admitted *pro hac vice*

14
Kristin Macleod-Ball, admitted *pro hac vice*

15
NATIONAL IMMIGRATION PROJECT
16
 OF THE NATIONAL LAWYERS GUILD
14 Beacon Street, Suite 602
17
Boston, MA 02108
(617) 227-9727
18
(617) 227-5495 (fax)

19
20
21
22
23
24
25
26

27
AMENDED COMPLAINT—CLASS ACTION FOR            NORTHWEST IMMIGRANT RIGHTS PROJECT
DECLARATORY AND INJUNCTIVE RELIEF                        615 Second Ave., Ste. 400
28
Case No. 2:17-cv-135-JLR            46                          Seattle, WA 98104
206-957-8611

**CERTIFICATE OF SERVICE**

I hereby certify that on March 10, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for all Defendants.  With respect to new Defendants U.S. Customs and Border Protection and the Attorney General, current counsel for Defendants, Stacy Young, has advised that she will not accept service for the agency. Therefore, along with a copy of the amended complaint and second motion for class certification, I arranged for *personal delivery* of these documents and corresponding proposed orders to:

United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271

as well as the mailing of these documents by *U.S. certified mail* to:

U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

and

U.S. Customs and Border Protection
Office of the Chief Counsel
1300 Pennsylvania Avenue, N.W.
Washington, DC 20229

Executed in Seattle, Washington, on March 10, 2017.

*s/ Matt Adams*
Matt Adams, WSBA No. 28287
NORTHWEST IMMIGRANT RIGHTS PROJECT

AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
Case No. 2:17-cv-135-JLR                47

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611