Honorable James L. Robart

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT
                     FOR THE WESTERN DISTRICT OF WASHINGTON
9                                   AT SEATTLE

10   Juweiya Abdiaziz ALI; A.F.A., a minor;
     Reema Khaled DAHMAN; G.E., a minor;          Case No. 2:17-cv-00135-JLR
11   Jaffer Akhlaq HUSSAIN; Seyedehfatemeh
     HAMEDANI; Olad Issa OMAR; Faduma
12   Olad ISSA; F.O.I., a minor; and S.O.I., a    **EMERGENCY MOTION FOR
     minor; on behalf of themselves as individuals   TEMPORARY RESTRAINING
13   and on behalf of others similarly situated,   ORDER AND PRELIMINARY
                                                  INJUNCTION**
14
                                Plaintiffs,
15
            v.
16                                                NOTE ON MOTION CALENDAR:
                                                  March 10, 2017
17   Donald TRUMP, President of the United States
     of America; Jefferson B. SESSIONS, Attorney  ORAL ARGUMENT REQUESTED
18   General of the United States; U.S.
     DEPARTMENT OF STATE; Rex W.
19   TILLERSON, Secretary of State; U.S.
     DEPARTMENT OF HOMELAND
20   SECURITY; John F. KELLY, Secretary of
     Homeland Security; U.S. CITIZENSHIP AND
21   IMMIGRATION SERVICES; Lori
     SCIALABBA, Acting Director of USCIS;
22   CUSTOMS AND BORDER PROTECTION;
     Kevin K. McALEENAN, Acting
23   Commissioner of CBP; OFFICE OF THE
     DIRECTOR OF NATIONAL
24   INTELLIGENCE; Michael DEMPSEY,
     Acting Director of National Intelligence,
25
26
27                             Defendants.

28

EMERGENCY MOT. FOR TRO AND PRELIM. INJ.               NORTHWEST IMMIGRANT RIGHTS PROJECT
Case No 2:17-cv-00135-JLR                                            615 Second Ave., Ste. 400
                                                                          Seattle, WA 98104
                                                                    Telephone (206) 957-8611

## I.    **INTRODUCTION**

This Court already has enjoined Defendants from giving effect to Executive Order 13769, "Protecting the Nation From Foreign Terrorist Entry Into the United States," 82 F.R. 8977 (Feb. 1, 2017) (EO1), seeking to ban nationals of seven predominantly Muslim countries from obtaining visas or entering the United States on previously issued visas. *See Washington v. Trump*, No. 2:17-cv-141-JLR, Dkt. 52 (W.D. Wash. Feb. 3, 2017); *see also Washington v. Trump*, 847 F.3d 1151, 2017 U.S. App. LEXIS 2369 (9th Cir. Feb. 9, 2017). Despite Defendants' continued public statements that they have the authority to take the actions enjoined by the Court, they have withdrawn their appeal of the injunction and, instead, issued a new executive order (EO2) with the same name and substance.[1] Indeed, Defendants admit that the purpose of these actions is to avoid the legal findings entered by this Court while at the same time seeking to replicate the substance of the initial executive order. Accordingly, the plaintiffs in *Washington* have asked this Court to clarify that the nationwide preliminary injunction applies with equal force to the actions proscribed in the second executive order. *Washington*, No. 2:17-cv-141-JLR, Dkt. 113 (W.D. Wash. Mar. 9, 2017)

If the Court does not agree with the plaintiffs in *Washington*, and does not immediately issue an order clarifying that the previously granted injunction applies to the second executive order, Plaintiffs and proposed class members face immediate irreparable harm on March 16, 2017, the order's effective date. For this reason, Plaintiffs now move for a temporary restraining order, along with preliminary injunctive relief, requesting that this Court schedule a hearing for either March 14, 2017 or March 15, 2017, so that Plaintiffs have the opportunity to seek redress before Defendants resume their unlawful conduct.[2]

---

[1]      Executive Order 13780, Protecting the Nation From Foreign Terrorist Entry Into the United States, 82 Fed. Reg. 13209 (Mar. 9, 2017).

[2]      On March 7, 2017, counsel for the parties conducted a telephonic status conference pursuant to FRCP 26(f). Counsel for Plaintiffs advised counsel for Defendants that Plaintiffs would file a motion for a temporary restraining order along with an amended complaint no later than Friday, March 10, 2017, and would request a hearing on the motion for a temporary restraining order on either Tuesday, March 14, or Wednesday, March 15. Counsel for Defendants did not object to those dates. *See Second Declaration of Matt Adams (Adams Decl.) ¶3.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611

## II.   <u>BACKGROUND</u>

As a Presidential candidate, Defendant Trump championed an explicit Muslim ban, "calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on."[3] When questioned about how this would work in practice, Defendant Trump said that customs officials "would [ask a prospective immigrant], are you Muslim?" and if the person said yes, they would not be allowed into the country.[4] When asked whether he believed that "Islam is at war with the U.S.," Defendant Trump responded "I think Islam hates us. . . . [W]e can't allow people coming into this country who have this hatred of the United States and of people who are not Muslim."[5] Soon after, Defendant Trump asserted that there was "no way" he would allow Muslims to "flow in" to the United States.[6] Subsequently, Defendant Trump linked a proposed nationality-based immigration ban to Islam by claiming that "[w]e are importing Radical Islamic Terrorism into the West through a failed immigration system" and singled out immigration of Muslims as a key problem.[7] He later declared that "Our way of life is under threat by Radical Islam."[8]

Following his election, Defendant Trump surrounded himself with advisors who had made public statements about being at war with Islam. In 2007, current White House Senior Policy Advisor Stephen Miller, then co-founder and President of the Terrorism Awareness Project, wrote in the organization's founding statement that America was in a "war against the Islamic jihad" and "its religion of terror," and urged students to "mobilize support for the

---

[3]   Donald J. Trump, Statement on Preventing Muslim Immigration (Dec. 7, 2015), *available at* https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration. Three days later, after British citizens responded to the proposed Muslim ban with a petition to block Defendant Trump from entering the United Kingdom, he responded by tweeting repeatedly about the United Kingdom's "massive Muslim problem." Donald J. Trump (@realDonaldTrump), Twitter (Dec 10, 2015, 07:49 AM), https://twitter.com/realdonaldtrump/status/674934005725331456.

[4]   Nick Gass, *Trump Not Bothered by Comparisons to Hitler*, Politico (Dec. 8, 2015), https://goo.gl/IkBzPO.

[5]   Theodore Schleifer, *Donald Trump: "I think Islam hates us*," CNN (Mar. 10, 2016), http://www.cnn.com/2016/03/09/politics/donald-trump-islam-hates-us/.

[6]   Donald J. Trump (@realDonaldTrump), Twitter (Mar. 22, 2016, 09:59 PM), https://twitter.com/realdonaldtrump/status/712473816614772736.

[7]   Donald J. Trump Addresses Terrorism, Immigration, and National Security, Donald Trump Campaign (June 13, 2016), *available at* http://bit.ly/1YmzAqO (criticizing U.S. government for admitting "100,000 immigrants from the Middle East and many more from Muslim countries outside of the Middle East").

[8]   Donald J. Trump (@realDonaldTrump), Twitter (July 25, 2016, 10:50 PM), https://twitter.com/realdonaldtrump/status/758872422028148740.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611

defense of America and the civilization of the West."[9] Current White House Chief Strategist Stephen Bannon, former CEO of Breitbart News and chief strategist for the Trump Campaign, stated in the past that "Islam is not a religion of peace. Islam is a religion of submission"[10] and that "we are in an outright war against jihadist Islamic fascism;" he previously urged Catholics to recall "the long history of the Judeo-Christian West struggle against Islam."[11] Both Bannon and Miller reportedly played critical roles in creating EO1.[12]

On January 27, 2017, Defendant Trump signed EO1 suspending visa adjudications and banning entry of individuals from seven predominantly Muslim countries (Iran, Iraq, Libya, Somalia, Sudan, Syria and Yemen) for 90 days to investigate visa screening requirements, with limited exceptions not relevant here. EO1. The text of EO1 prioritizes refugees claiming religious-based persecution who are religious minorities in their country of nationality, effectively deprioritizing Muslim refugees from majority Muslim nations. EO1 § 5(b). While signing EO1, Defendant Trump stated that he was "establishing new vetting measures to keep radical Islamic terrorists out."[13] That same day, Defendant Trump agreed that the refugee programs changes were made to prioritize Christians, and falsely stated that "If you were a Muslim you could come in [as a refugee], but if you were a Christian, it was almost impossible."[14] Two days later, Defendant Trump tweeted that "Christians in the Middle-East

---

[9]     Terrorism Awareness Project, About the Project (Feb. 3, 2007), *available at* https://web.archive.org/web/20070203001212/http://www.terrorismawareness.org/about/3/about-the-project?pg=2 (last visited Mar. 10, 2017); *see also* Andrew Kaczynski and Chris Massie, *In College, Trump Aide Stephen Miller Led Controversial 'Terrorism Awareness Project' Warning of 'Islamofascism,'* CNN (Feb. 15, 2017), *available at* http://www.cnn.com/2017/02/15/politics/kfile-stephen-miller-terrorism-awareness.

[10]     Andrew Kaczynski, *Steve Bannon in 2010: 'Islam is not a religion of peace. Islam is a religion of submission*, CNN (Feb. 1, 2017), *available at* http://www.cnn.com/2017/01/31/politics/kfile-bannon-on-islam/.

[11]     Scott Shane, *Stephen Bannon in 2014: We Are at War With Radical Islam*, NY Times (Feb. 1, 2017).

[12]     Reuters, *Bannon Driving Force Behind Trump's Hardline Immigration Ban, Officials Say*, Newsweek, Jan. 30, 2017, *available at* http://www.newsweek.com/donald-trump-steve-bannon-immigration-ban-immigration-muslim-550415.

[13]     Dan Merica, *Trump Signs Executive Order to Keep Out 'Radical Islamic Terrorists'*, CNN (Jan. 30, 2017), *available at* http://cnn.it/2jeLXsW.

[14]     David Brody, *Brody File Exclusive: President Trump Says Persecuted Christians Will Be Given Priority As Refugees*, CBN News (Jan. 27, 2017), *available at* http://bit.ly/2kCqG8M; *see also* Michael D. Shear & Helene Cooper, *Trump Bars Refugees and Citizens of 7 Muslim Countries*, NY Times (Jan. 27, 2017) (Defendant Trump "ordered that Christians and others from minority religions be granted priority over Muslims."); Dkt. 52 ¶96.

have been executed in large numbers. We cannot allow this horror to continue!"[15]

Also on January 29, 2017, Rudolph Giuliani, Defendant Trump's advisor on cybersecurity, confirmed that EO1 was intended to be a "legal" ban on Muslims: "So when [Trump] first announced it, he said, 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.'"[16] Mr. Giuliani's admission is supported by Defendant Trump's own explanation of EO1: "People were so upset when I used the word Muslim. Oh, you can't use the word 'Muslim.' Remember this. And I'm okay with that, because I'm talking territory instead of Muslim."[17]

Following EO1, the government denied entry and revoked the visas of tens of thousands of individuals.[18] The government suspended all visa processing, cancelling consular interviews and suspending adjudication of immigrant visa applications for thousands of proposed class members from the seven countries, leaving them stranded abroad and indefinitely separated from their families and employment.[19] Plaintiffs and proposed class members suffered both emotionally and financially from these separations and from the existing lack of certainty and transparency in the immigrant visa process. *See* Dkts. 11–25.

On February 3, 2017, this Court issued a nationwide TRO in *Washington*, No. 2:17-cv-141-JLR, enjoining and restraining Sections 3(c), 5(a)-(c), and 5(e) of EO1. On February 4, 2017, the government appealed the injunction to the Ninth Circuit and moved to stay this Court's order. *See* Emergency Motion, *Washington*, 847 F.3d 1151 (9th Cir. 2017), ECF 14.[20]

---

[15]   Donald Trump (@realDonaldTrump), Twitter (Jan. 29, 2017, 07:04 AM) https://twitter.com/realDonaldTrump/status/825721153142521858.

[16]   Amy B. Wang, *Trump Asked for a "Muslim ban," Giuliani Says—And Ordered a Commission to Do It "legally,"* Wash. Post (Jan. 29, 2017), *available at* http://wapo.st/2mscqBN.

[17]   Rebecca Shabad, *Donald Trump Says He's Expanding His Muslim Ban*, CBS News (July 25, 2016), *available at* http://www.cbsnews.com/news/donald-trump-says-hes-expanding-muslim-ban.

[18]   Mica Rosenberg & Lesley Wroughton, *Trump's travel ban has revoked 60,000 visas for now*, Reuters (Feb. 3, 2017), *available at* http://www.reuters.com/article/us-usa-immigration-visas-idUSKBN15I2EW.

[19]   *See* Dkt. 10-1 (stating, in a DOS announcement removed after the TRO in *Washington* issued, "Q: I have an emergency. Can I request an expedited appointment? A: No. The Department of State may not conduct immigrant visa interviews for any persons who are nationals of [the seven targeted countries] at this time.").

[20]   Following the appeal, Defendant Trump stated on Twitter that "Courts must act fast" because "[t]he threat from radical Islamic terrorism is very real." Donald Trump (@realDonaldTrump), Twitter (Feb. 6, 2017, 09:49 PM), https://twitter.com/realdonaldtrump/status/828797801630937089.

Before the Ninth Circuit, leading national security experts, including former Secretary of State John Kerry, criticized EO1 as unmoored from legitimate national security claims. *See Joint Declaration of Madeleine K. Albright et al.* at 2, *Washington*, 847 F.3d 1151 (9th Cir. 2017), ECF 28-2. After briefing and argument, on February 9, 2017, a panel of the Ninth Circuit rejected the government's motion to stay this Court's decision. *Washington*, 847 F.3d 1151.[21]

On February 16, 2017, Defendant Trump stated that "only problem" with EO1 was a "bad court" and a "bad decision" and that, had the roll-out of the order been scheduled over a period of a month, "everything would have been perfect." [22] He announced that a new executive order would be issued and that it "is going to be very much tailored to what I consider a very, very bad decision . . . . We can tailor the order to the decision to get just as much."[23] On February 18, 2017, Defendant Trump stated: "I've taken decisive action to keep radical Islamic terrorist[s] the hell out of our country."[24] On February 23, 2017, White House Press Secretary Sean Spicer explained that the Administration would continue to litigate all pending challenges to EO1, but that, in addition, it would issue a new executive order to "further address the problems."[25] On February 21, 2017, White House Senior Policy Advisor Stephen Miller said that the new order would have "mostly minor technical differences," but that the "basic policies [of EO1] are still going to be in effect."[26]

---

[21]     Even a draft of Defendants' own post-hoc review concluded that the ban was ineffective. *See* Vivian Salama & Alicia A. Caldwell, *AP Exclusive: DHS Report Disputes Threat from Banned Nations*, ASSOC. PRESS (Feb. 24, 2017), *available at* http://apne.ws/2ldKZtf.

[22]     Donald J. Trump, News Conference (Feb. 16, 2017), *transcript available at* http://nyti.ms/2kXcFW4.

[23]     Jennifer Jacobs, *Trump Delaying Revamped Immigration Order Until Next Week, Official Says*, Bloomberg (Feb. 22, 2017), *available at* http://bloom.bg/2nnqHi6.

[24]     President Donald Trump, Remarks at Rally in Melbourne, Florida (Feb 18, 2017), *available at* http://pbpo.st/2kLCMfr.

[25]     White House Press Briefing (Feb. 23, 2017), *transcript available at* https://www.whitehouse.gov/the-press-office/2017/02/23/press-briefing-press-secretary-sean-spicer-2232017-15 (emphasis added). *See also* White House Press Briefing (Feb. 21, 2017), *transcript available at* https://www.whitehouse.gov/the-press-office/2017/02/21/press-briefing-press-secretary-sean-spicer-2212017-13; White House Press Briefing (Feb. 22, 2017), *transcript available at* https://www.whitehouse.gov/the-press-office/2017/02/22/press-briefing-press-secretary-sean-spicer-2222017-14.

[26]     *The First 100 Days* (Fox News television broadcast Feb. 21, 2017), *transcript available at* http://www.foxnews.com/transcript/2017/02/21/miller-new-order-will-be-responsive-tojudicial-ruling-rep-ron-desantis; *see also* White House Press Gagle (Mar. 6, 2017), *transcript available at* https://www.whitehouse.gov/the-press-office/2017/03/06/press-gaggle-press-secretary-sean-spicer (including statement of White House Press Secretary Sean Spicer that "if you think about it, the principles of the executive order remain the same").

In response to the ongoing litigation, Defendant Trump issued EO2 on March 6, 2017, incorporating many of the substantive provisions of EO1. *Compare*, *e.g.*, EO1 § 3(c) ("suspend[ing] entry into the United States, as immigrants and nonimmigrants, of [noncitizens from seven specified countries] for 90 days from the date of this order" with limited exclusions and an alleged waiver) *with* EO2 § 2(c) ("direct[ing] that the entry into the United States of nationals of those six countries be suspended for 90 days" subject to limitations and exceptions and an alleged waiver); *see also* EO2 §§ 1(c), (f). EO2, in relevant part, suspends visa issuance of and entry of many nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen indefinitely, and at a minimum for 90 days. EO §§ 1(f), 3(c). Moreover, §§ 2(d)-2(f) of the EO2 provides that the government will not automatically lift the initial 90-day suspension period for any of the targeted countries. Instead, these sections provide a complex, multi-step process for determining what additional information-sharing each country must adopt to lift the ban.[27] Notably, both EOs allege that a 90-day ban is necessary to review and determine what additional information is needed for visa adjudications. Although that review period was not previously enjoined, EO2 nonetheless resets the 90-day period and thereby extends the ban on entry and visa issuance for nationals of the six countries. *See* EO2 § 2(c). Furthermore, like EO1, EO2 targets nationals of the listed countries, including children and anyone who derived citizenship but never resided there. *See* Dkt. 19 at 2.

Unlike EO1, EO2 contains certain exceptions as well as a "waiver" provision. The "waiver" purportedly allows for visa issuance and entry upon a showing that: (1) the ban would cause "undue hardship"; (b) the person is not a "threat to national security"; and (c) issuance and entry would be in the "national interest." EO2 § 2(c). There is no guidance on when or how individuals are to apply for the waiver before a consular officer or Defendant Customs and Border Protection (CBP), what constitutes "undue hardship," or how to prove that entry is in the "the national interest." Additionally, given that all persons applying for an immigrant visa submit detailed biographical histories regarding past residences, school, and employment, undergo

---

[27] The six targeted countries will be unwilling or unable to complete this process. *See* Dkt. 52 ¶¶75-83.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611

fingerprint and database checks, submit police reports, and may be the subject of a security advisory opinion, it is unclear how they can further prove that they are not a security threat. Indeed, the EO places the burden on the waiver applicant to prove a negative fact, notwithstanding the lack of available evidence to do so. Considering that the premise of the EOs is that, by simply being a national of one of the six countries, the individual is a national security threat, the waiver provision imposes an almost insurmountable obstacle. Finally, notwithstanding these flaws, even if one managed to figure out how to apply for a waiver and make a threshold eligibility showing, the waiver is entirely dependent on the discretion of either the consular officer or a CBP official.

### III.   ARGUMENT

**A.  STANDARD FOR OBTAINING PRELIMINARY RELIEF**

To obtain a TRO or preliminary injunction (PI), the moving party must show that: (1) she "is likely to succeed on the merits," (2) she "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [her] favor," and (4) "an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).[28] The Ninth Circuit uses a balancing, or "sliding scale," approach to evaluate TROs and PIs, clarifying that, where the balance of equities weighs strongly in her favor, the moving party may prevail if she shows that her claims raise serious legal questions and meets the remaining factors. *See, e.g.*, *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011). "Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id*. at 1131-32. Under any test, Plaintiffs and the proposed class merit relief.

**B.  PLAINTIFFS AND PROPOSED CLASS MEMBERS MERIT A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF.**

**1.  Plaintiffs Have Standing to Raise Their Claims.**

---

[28] The standards for TROs and PIs are substantially the same. *See, e.g.*, *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611

Plaintiffs satisfy all requirements necessary to demonstrate standing. *See Friends of the Earth, Inc. v. Laidlaw Envlt. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). The Administrative Procedure Act (APA) authorizes suit if a plaintiff is "suffering legal wrong because of agency action, or [was] adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Plaintiffs fall squarely within the zone of interests protected by the laws governing the adjudication, issuance, and honoring of immigrant visas, which require a non-discriminatory and constitutional application. *See* 8 U.S.C. §§ 1152(a)(1); 1153; 1154; 1201; *see also infra* III.B.2.a. Thus, the interests they seek to protect are within the zone of interests. *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). Indeed, in appealing the injunction this Court issued in *Washington*, Defendants' counsel readily acknowledged that Plaintiffs and other individuals directly affected by EO1 would have standing to challenge Defendants' actions.[29]

Plaintiffs also have standing to raise their claims irrespective of their location. *See Washington*, 2017 U.S. App. LEXIS 2369, at *24 (holding that "[t]he procedural protections provided by the Fifth Amendment's Due Process Clause are not limited to citizens" and discussing cases); *id.* at *30-31 (acknowledging, but reserving consideration of, plaintiffs' claim that EO1 was "intended to disfavor Muslims"); *Kwai Fun Wong v. United States*, 373 F.3d 952, 974 (9th Cir. 2004) ("[T]the entry fiction does not preclude substantive constitutional protection."); *Rasul v. Bush*, 542 U.S. 466, 484 (2004) (finding that "[t]he courts of the United States have traditionally been open to nonresident [noncitizens]").

## 2.  Plaintiffs Are Likely to Prevail on Their Claims.

Plaintiffs and proposed class members can show a strong probability of success on the merits of their claims. However, they need only show "serious questions going to the merits," which abound in this case, because the "balance of hardships . . . tips sharply" in their favor and

---

[29]    *See* Feb. 7, 2017 Oral Argument, *Washington*, No. 17-35105 (9th Cir.), at 24:25-24:41, *available at* http://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000010885.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611

they show a likelihood of irreparable harm and that a TRO is in the public interest. *Alliance for the Wild Rockies*, 632 F.3d at 1135. Under either inquiry, Plaintiffs can demonstrate that the EOs, and their application and enforcement, would fly squarely in the face of the Constitution, the Immigration and Nationality Act (INA), and the APA.

**a. Likelihood of Success on 8 U.S.C. § 1152(a)(1), APA, and Mandamus Claims**

Plaintiffs are likely to prevail on their claims that the EOs violate 8 U.S.C. § 1152(a)(1), that the suspension in visa adjudication and issuance that will result from its implementation violates both this statute and the APA, and that mandamus relief is warranted. First, the EOs violate § 1152(a)(1)(A), which bars discrimination in visa issuance based on, inter alia, "nationality, place of birth, or place of residence." Section 2 of EO2 violates the plain language of the statute because it discriminates on the basis of nationality. *See Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself."). The EO broadly suspends regular visa issuance to and entry[30] of immigrant visa holders from six *nations* absent a visa issued before March 16, 2017. As with EO1, EO2 will result in the suspension of adjudication and issuance of immigrant visas to nationals of those countries when it takes effect. *See* Adams Decl., Exh. A (advising visa applicants to check for further guidance "before paying an MRV fee, scheduling an interview appointment, or attending your interview").[31] Therefore, the EOs violate § 1152(a)(1) by using a nationality-based classification that Congress expressly forbade. *See Almero v. INS*, 18 F.3d 757, 763 (9th Cir. 1994) ("[T]he INS may not *restrict* eligibility to a smaller group of beneficiaries than provided for by Congress").

The EO also violates the congressional intent and the object and policy behind §

---

[30] Plaintiffs challenge the bar on "entry" in that it prevents the lawful adjudication of their applications for admission—they do not seek a guarantee that they will be admitted after an individualized inspection under lawful constitutional and statutory standards. *Cf. St. Cyr v. INS*, 533 U.S. 289, 307 (2001) (acknowledging the "distinction between eligibility for discretionary relief . . . and the favorable exercise of discretion").

[31] Following EO1, Defendants suspended the adjudication of immigrant visa applications. *See* Dkt. 10-1 (announcing temporary halt on scheduling appointments and processing of immigrant visa applications for banned countries, and urging those with medical appointments to cancel them, as they results are "only valid for six (6) months and we cannot predict when your visa interview will be rescheduled").

MOT. FOR TRO AND PRELIM. INJ.
Case No 2:17-cv-00135-JLR                9

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611

1152(a)(1)(A)'s enactment. *See Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991)

(noting that statutory interpretation includes consideration of the design of the statute and its

object and policy.). In the Immigration and Nationality Act of 1965, Pub. L. No. 89–236, 79 Stat.

911 (1965), Congress enacted § 1152(a)(1) to repudiate the discriminatory national origins quota

system that previously had restricted immigration on the basis of national origin.[32] *See* S. REP.

89-748, 1965 U.S.C.C.A.N. 3328, 3329 (1965) (noting that the "primary objective" of the 1965

Act was "the abolishment of the national origins quota system"); *Fei Mei Li v. Renaud*, 654 F.3d

376, 377 (2d Cir. 2011) (summarizing the history of the national origins quota system); *Haitian

Refugee Ctr. v. Civiletti*, 503 F. Supp. 442, 453 (S.D. Fla. 1980) ("[8 U.S.C. § 1152(a)(1)(A)]

manifested Congressional recognition that the maturing attitudes of our nation made

discrimination on [the listed] bases improper.").

   In 1995, the D.C. Circuit held that a State Department policy excluding Vietnamese

nationals from applying for visas in Hong Kong, rather than in their country of origin, violated 8

U.S.C. § 1152(a)(1)'s prohibition against nation origin discrimination. *Legal Assistance for

Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 45 F.3d 469, 473

(D.C. Cir. 1995), *abrogated on other grounds*, 104 F.3d 1349 (D.C. Cir. 1997). The court agreed

with the appellants that "this statute compels this court to invalidate any attempt to draw a

distinction based on nationality in the issuance of visas," rejected the appellees' argument that

such a distinction could be justified by a rational basis, and concluded that "Congress has

unambiguously directed that no nationality-based discrimination shall occur." *Id*. Subsequently,

Congress added subsection (B), which states that the provision does not limit the Secretary of

State's authority to determine the procedures or location of immigrant visa processing. 8 U.S.C.

§ 1152(a)(1)(B). Consequently, the D.C. Circuit upheld the State Department's policy as it

applied *only* to the location of visa processing. *Legal Assistance*, 104 F.3d at 1352-53.

   Here, § 1152(a)(1)(B) does not excuse the ban, both because the EOs represent the

---

[32] Section 1152(a)(1) is the predecessor statute to current § 1152(a)(1)(A) and contains identical language.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611

President's policy (not the State Department's, although the latter is implementing it), but more importantly, because a suspension of visa issuance for nationals of these countries is not a mere "determ[ination about] the procedures" or the location for visa processing. Instead, the EOs categorically render all those subject to the ban ineligible to move forward with their visa applications, not based on any individual determination, but instead, based on their nationality or country of birth. All that is left then is for them to attempt to seek a limited, arduous, and discretionary waiver. *See supra* Section II.[33] But the existence of a possible waiver, does not in any way refute the fact that Plaintiffs' immigrant visa applications are discriminated against on the basis of their nationality or country of birth, in direct conflict with § 1152(a)(1).

Defendant Trump purportedly issued the EOs pursuant to 8 U.S.C. § 1182(f), which grants the Executive broad authority to suspend the entry of either "any [individual] aliens" or "any class of aliens" into the United States. However, the President's authority under § 1182(f) is confined by statutory and constitutional limits. Statutory construction rules demonstrate that § 1182(f) cannot supersede the limitations created by Congress in 8 U.S.C. § 1152(a)(1)(A). First, the plain language of the statute does not authorize a categorical suspension of *all* "aliens" or "nationals" covered by the nondiscrimination provision in § 1152(a)(1)(A); rather, in limiting that authority to "*any* alien" in the singular or "any class of aliens," the statute distinguishes between individuals or a subset of individuals, as compared to *all* individuals of a particular nationality.[34] Second, at the time Congress enacted § 1152(a), it is presumed to have been aware of the authority conferred to the President in § 1182(f). *See Lorillard v. Pons*, 434 U.S. 575, 581 (1978) ("Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."). Thus, as it was aware of the President's authority under § 1182(f), Congress presumably intended § 1152(a)(1)(A) to act as a limit on that authority. *Id.*; *cf. Radzanower v. Touche Ross*

---

[33]     Even if a system for seeking waivers were developed and even if proposed class members, many of whom are unrepresented, were able to navigate it and present evidence that they fall within the waiver categories which are replete with ambiguous terms, they would still be subject to extra-statutory visa requirements applied on a discriminatory basis. *See supra* Section II; *infra* Section III.B.3.

[34]     *See Consumer Product Safety Commission,* 447 U.S. at 108.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611

& *Co.*, 426 U.S. 148, 154 (1976) ("where provisions in [] two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one") (citation omitted). Third, § 1152(a)(1)(A) is narrower in scope than § 1182(f), and the more specific provision must be given effect. *See Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 524 (1989) ("A general statutory rule usually does not govern unless there is no more specific rule."). Pursuant to § 1152(a)(1)(A), the President can no more suspend entry by individuals from the targeted six countries than he can suspend issuance of immigrant visas to all female or all non-Caucasian applicants.[35] Similarly, 8 U.S.C. § 1185(a) does not authorize this. That statute, which governs certain entries and departures, serves to regulate conduct but does not provide independent authority to institute any type of categorical ban. Thus, § 1185(a) is narrower than § 1152(a)(1)(A) and must be read as subject to the latter's non-discrimination limitations.

The plain language of, and congressional intent in enacting, 8 U.S.C. § 1187(a)(12) also do not sanction discrimination in issuing immigrant visas based on national origin. That statute relates only to which countries may qualify for the "visa waiver" program, which allows nationals of certain countries to temporarily enter the United States without a nonimmigrant visa. By its terms, it is limited to nonimmigrant visas, not the immigrant (i.e., permanent) visas at issue here. Thus, there is no inconsistency between § 1152(a)(1)(A) and § 1187(a)(12). Moreover, nationals who benefit from the visa waiver program do not submit any visa application and, accordingly, are not vetted before admission. Statements regarding the instability of the governments in the targeted countries, *see* EO2 § 1(e), could be relevant to

---

[35] Notably, not a single President has invoked § 1182(f) to authorize such a broad and discriminatory nationality-based suspension of entry. The closest analogue to Defendant Trump's EOs was President Reagan's 1986 temporary suspension of Cuban immigration in response to a diplomatic dispute with the Cuban government. Proclamation 5517, 51 Fed. Reg. 30470 (1986). That proclamation, however, was never challenged as violating § 1152(a)(1)(A) and it included, inter alia, a carve out for all immediate relative visa petitions and certain other family-based visa petitions. Moreover, although previous presidents have invoked § 1182(f) in over forty instances, these proclamations have been narrowly tailored to address specific individuals whose entry would be inconsistent with U.S. foreign policy interests. *See, e.g.*, Proclamation 5887, 53 Fed. Reg. 43184 (1988) (suspending the entry of officers of the Nicaraguan government or the Sandinista National Liberation Front); Executive Order 13694, 80 Fed. Reg. 18077 (2015) (suspending the entry of persons determined to have engaged in "significant malicious cyber-enabled activities").

MOT. FOR TRO AND PRELIM. INJ.
Case No 2:17-cv-00135-JLR                    12

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611

determinations regarding admissions to the U.S. *without any visa application and screening*, but do not support a bar on the immigrant visa process, through which all applicants are thoroughly screened through several security and medical clearance processes. *See* Dkt. 52 ¶¶38-43.

Second, Plaintiffs are likely to prevail on their claim that Defendants' implementation[36] of the nationality-based classification will violate the APA's prohibition against unlawful and unconstitutional government conduct, *see* 5 U.S.C. §§ 706(2)(A)-(D), thus creating a "legal wrong" and an agency action that "adversely affect[s] or aggrieve[s]" which entitles Plaintiffs and proposed class members to relief under the APA. 5 U.S.C. § 702. Not only is Defendants' disregard for § 1152(a)(1)(A) "not in accordance with law," "in excess of statutory jurisdiction," and "without observance of procedure required by law," it is "contrary to constitutional right." 5 U.S.C. § 706(2)(A)-(D); *see infra* Sections II.B.2.b and d.

Third, Plaintiffs are likely to succeed on their request for relief under 28 U.S.C. § 1361. Mandamus relief is warranted if "(1) the individual's claim is clear and certain; (2) the official's duty is nondiscretionary, ministerial, and so plainly proscribed as to be free from doubt; and (3) no other adequate remedy is available." *Patel v. Reno*, 134 F.3d 929, 931 (9th Cir. 1997). Plaintiffs have a clear claim to nondiscriminatory adjudication and issuance of their immigrant visas; Defendants' duties to lawfully adjudicate, issue, and honor immigrant visas are plainly set forth in the INA, implementing regulations, Foreign Affairs Manual, and are further governed by the Constitution.

The Ninth Circuit has held that "[m]andamus may not be used to instruct an official how to exercise discretion unless that official has ignored or violated 'statutory or regulatory standards delimiting the scope or manner in which such discretion can be exercised.'" *Silveyra v. Moschorack*, 989 F.2d 1012, 1015 (9th Cir. 1993) (citation omitted). In such an event,

---

[36] Plaintiffs bring the APA claim against all Defendants other than Defendant Trump. They raise their separate claim under 8 U.S.C. § 1152(a)(1)(A) against all Defendants; for this claim, the APA serves to waive sovereign immunity only. *See Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 510 n.4 (1999) (Souter, J., dissenting) ("This waiver of immunity [under § 702] is not restricted by the requirement of final agency action that applies to suits under the [APA].") (citing *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 523-26 (9th Cir. 1989)).

"mandamus is appropriate." *Id.* at 1014. Defendants have violated the non-discrimination requirement in § 1152(a)(1)(A) and exceeded the scope of their discretionary authority to determine procedures and locations for immigrant visas issuance under 8 U.S.C. § 1152(a)(1)(B) and to suspend entry under 8 U.S.C. § 1182(f). Absent intervention by this Court, Defendants will, contrary to their duties, leave Plaintiffs and class members in legal limbo potentially indefinitely, and at a minimum for 90 days. EO §§ 1(f), 3(c).

Thus, Plaintiffs are likely to succeed on their statutory claims.

### b.  Likelihood of Success on Equal Protection Claim

Plaintiffs also are likely to succeed on their claim that the EOs violate the guarantee of equal protection under the Fifth Amendment's Due Process Clause because it suffers from the same underlying nationality discrimination and religious animus as EO1. Executive orders are subject to constitutional limits. *See, e.g.*, *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 587-89 (1952) (holding that the President acted without constitutional power by issuing an order directing the Commerce Secretary to take over the nation's steel mills); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985) (analyzing whether an executive order violated plaintiffs' First Amendment rights); *cf. United States v. Nixon*, 418 U.S. 683 (1974) (President, as head of the executive branch, is not above the law).

On its face and when applied, Section 2(c) of the EO2 discriminates on the basis of nationality by singling out, and categorical banning, nationals of six countries. Moreover, although EO2 is more artfully drafted than EO1 and attempts to expressly disclaim EO1's blatant discrimination against Islam, EO2 indisputably stems from the same religious animus underlying EO1. *See* Section II. Nationality and religion are "suspect classifications," so claims of discrimination on these bases are subject to strict scrutiny, and such classifications must be narrowly tailored and justified by a compelling government interest. *See Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001); *Christian Sci. Reading Room Jointly Maintained v. City of San Francisco*, 784 F.2d 1010, 1012 (9th Cir. 1986); *see also Hassan v. City of New York*, 804 F.3d

277, 301 (3d Cir. 2015). To prevail, Plaintiffs must show that the EOs either are discriminatory on their face or that discriminatory animus against a protected class was a "motivating factor." *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (internal citation omitted). The EOs fails under a strict scrutiny test because: 1) they discriminate, on their face, based on nationality; and 2) animus against Muslims was a motivating factor.

Under well-established equal protection law, courts may look behind a facially neutral law, or in this case the EOs, to determine whether animus inhered in its passage. *See, e.g.*, *Washington*, 2017 U.S. App. LEXIS 2369, at *30-31; *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266–268 (1977). In examining whether a facially neutral action impermissibly targets a religion, a court may consider "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) (summarizing *Village of Arlington Heights*). As detailed in Section II, consideration of the historical background of EO1 and EO2, the events leading up to EO1's revocation—namely, this Court's and the Ninth Circuit's injunction decisions in *Washington*—as well as statements made by the President and his affiliates, strongly support the conclusion that religious animus against Islam undergirds EO2.

Furthermore, even if the Court were to apply a rational basis analysis, Plaintiffs are likely to prevail. *See*, *e.g.*, *Ram v. INS*, 243 F.3d 510, 517 (9th Cir. 2001) (evaluating whether "'[l]ine-drawing' decisions made by . . . the President in the context of immigration and naturalization . . . are rationally related to a legitimate government purpose"); *United States v. Barajas-Guillen*, 632 F.2d 749, 753 (9th Cir. 1980) (applying rational basis review in an immigration case because no "suspect classification"—which would "demand" strict scrutiny—was involved); *Gonzalez-Medina v. Holder*, 641 F.3d 333, 336 (9th Cir. 2011) (same). Where a government's proposed solution to a problem is discrimination against a

disfavored class and all evidence shows that such a solution is "ludicrously ineffectual," the government has not acted rationally. *Plyer v. Doe*, 457 U.S. 202, 228 (1982) ("[W]e think it clear that '[charging] tuition to undocumented children constitutes a ludicrously ineffectual attempt to stem the tide of illegal immigration'") (internal citation omitted).

Accordingly, Plaintiffs are likely to prevail on their equal protection argument.

### c.  Likelihood of Success on Establishment Clause Claim

U.S. citizen and LPR Plaintiffs and class members are likely to succeed in their claim that Defendants violated the Establishment Clause. *See* U.S. Const. amend. I.[37] "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). Where the government acts to disfavor one religion by, inter alia, placing "burdens . . . on particular denominations," its actions are subject to strict scrutiny. *Id*. at 246-47, 254. In this determination, "[i]t is well established that evidence of purpose beyond the face of the challenged law may be considered." *Washington*, 2017 U.S. App. LEXIS 2369, at *30; *Larson*, 456 U.S. at 254-55 (finding facially neutral statute invalid based on legislative history indicating it disfavored particular denominations). EO2, which is an express continuation of EO1, revoking EO1 only on the date it becomes effective, uniquely disfavors Muslims and burdens Plaintiffs and proposed class members, based on religious bias, with discriminatory treatment, inability to enter the United States and stigma; Defendants cannot show that it is closely fitted to a compelling government interest. *See supra* Section III.B.2b. Thus, the EOs cannot survive strict scrutiny.

Even if the Court finds that the EOs do not "grant[] a denominational preference," *Larson*, 456 U.S. at 246, Plaintiffs nonetheless are likely to succeed on their claim, because the EOs cannot survive the three-part test for evaluating compliance with the Establishment Clause in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). A government action must first "have a secular . . . purpose; second, its principal or primary effect must be one that neither advances nor inhibits

---

[37]     The Ninth Circuit noted, in its analysis of EO1, that the plaintiffs' Establishment Clause claim "present[ed] significant constitutional questions." *Washington*, 2017 U.S. App. LEXIS 2369, at *31.

MOT. FOR TRO AND PRELIM. INJ.
Case No 2:17-cv-00135-JLR                    16

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611

religion; finally, the [action] must not foster 'an excessive government entanglement with religion.'" 403 U.S. at 612-13 (citations omitted). The EOs fail, especially as to the first two elements.

First, the purpose of the EOs is not secular. Despite the shoddy façade with which Defendants now cover their motivations, EO2 is, in relevant substantive part, a nearly-identical continuation of EO1; both were intended to mark Muslims for disfavored treatment. *See* Dkt. 52 ¶¶84-98; *supra* Section II. No country with a different religious majority, regardless of political instability or lack of cooperation with the U.S. government, is similarly targeted. *See, e.g.*, *id.* at ¶¶105 (discussing comments of Defendant Kelly that other countries, "not all of them Muslim countries, not all of them in the Middle East that have questionable vetting procedures" not included in the ban). This is impermissible despite the different stated purpose; "the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary County v. ACLU*, 545 U.S. 844, 864 (2005). As a result, courts must "refuse to turn a blind eye to the context in which [a] policy arose." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 315 (2000); *id.* at 309 (evaluating "evolution" of an allegedly secular policy). Even if the Court would find EO2, considered apart from EO1 and Defendants' history of seeking a "Muslim ban," constitutional, Plaintiffs can still succeed on the merits of their Establishment Clause claim. "[T]he same government action may be constitutional if taken in the first instance and unconstitutional if it has a sectarian heritage." *McCreary*, 545 U.S. at 866 n.14. This Court should look to "external signs that show up in the text, legislative history, and implementation of" and "the specific sequence of events leading to" EO2. *Id.* at 862 (internal quotation marks omitted); *see also Aziz v. Trump*, 2017 U.S. Dist. LEXIS 20889, *18-28 (E.D. Va. Feb. 13, 2017) (holding that plaintiffs challenging EO1 were likely succeed on Establishment Clause claim that the Order did not have a secular purpose based on the "'sequence of events' leading to this specific EO and the dearth of evidence indicating a national security purpose").

MOT. FOR TRO AND PRELIM. INJ.
Case No 2:17-cv-00135-JLR                                                17

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611

Second, the principal effect of the EOs is to inhibit religion. By singling out and barring visa issuance for applicants from six predominantly Muslim nations, the EOs' operation will have the intended effect of limiting the ability of Muslims to immigrate to the United States and further stigmatizing Islam as disfavored by the U.S. government. *See* Section II. Such stigma will not only harm Plaintiffs and proposed class members, but likely will harm Muslims living in the United States, and potential immigrants abroad discouraged from seeking admission. Again, the Court should not undertake this analysis in a vacuum, but "from the point of view of a reasonable observer who is informed . . . [and] familiar with the history of the [EO] at issue." *Vasquez v Los Angeles County*, 487 F.3d 1246, 1256 (9th Cir. 2007); *id.* at 1257 (considering whether an act is "one of hostility towards religion").

### d. Likelihood of Success on Due Process Claim

Plaintiffs also are likely to succeed on their due process claim that the EOs deprive U.S. citizen and LPR Plaintiffs and proposed class members of their Fifth Amendment liberty interests in marriage, family life, and child-rearing. *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1, 12 (1967); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.); *Bustamante v. Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008).[38] Proposed class members that are U.S. based-employers similarly have constitutionally protected interests.[39]

Congress has made clear that immigrant visas must be adjudicated, issued, and honored in a manner that does not discriminate based upon national origin, country of birth, or religion.[40] At a minimum, due process protects against discriminatory action that deprives Plaintiffs and

---

[38]      Furthermore, "the foremost policy underlying the granting of [immigrant preference] visas under our immigration laws …[is] the reunification of families." *Lau v. Kiley*, 563 F.2d 543, 547 (2d Cir. 1977); *see also Kaliski v. Dist. Dir. of Immigration & Naturalization Serv.*, 620 F.2d 214, 217 (9th Cir. 1980) ("[T]he humane purpose [of the INA] is to reunite families.").

[39]      *See Citizens United v. FEC*, 558 U.S. 310, 342 (2010) (First Amendment protection extends to corporations); *Minneapolis & S. L. R. Co. v. Beckwith*, 129 U.S. 26, 28 (1889) ("[C]orporations can invoke the benefits of provisions of the Constitution and laws which guarantee to persons the enjoyment of property, or afford to them the means for its protection, or prohibit legislation injuriously affecting it.").

[40]      EO2 discriminates on the basis of national origin and on the basis of religion, and is at least partially motivated by an animus against a religion and nationalities. *See supra* Sections II, III.B.2.b, III.B.2.c.

MOT. FOR TRO AND PRELIM. INJ.
Case No 2:17-cv-00135-JLR                                18

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611

proposed class members of their protected liberty interests without regard for Congressionally imposed constraints, *see supra* Section III.B.2.a, and the constitutional boundaries imposed by the Establishment Clause of the First Amendment and the Fifth Amendment's guarantee of equal protection, *see supra* Sections III.B.2.b, III.B.2.c. *See, e.g.*, *Del Monte Dunes v. Monterey*, 920 F.2d 1496, 1508 (9th Cir. 1990) ("We cannot say at this stage of the proceeding that the actions of the city council . . . were not arbitrary and irrational and, thus, a violation of appellants' substantive due process rights."); *Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.").

In addition, Section 2 of EO2 creates a presumptive categorical bar to immigrant visa processing: it is not individualized and is potentially permanent. *See* Section II. Plaintiffs have had little advanced notice of the bar. *Id.* Immigrant visa applicants who, as an immutable fact, are nationals of the six designated countries, have no opportunity to respond to, let alone refute, application of this categorical bar. Indeed, for the reasons set forth in Section II, the alleged ability to seek a waiver under EO2 Section 3(c) does not eliminate Plaintiffs' due process injuries; first, they indisputably face harm from the categorical and substantive bar that, at a minimum, causes additional separation; second, they must satisfy a heightened showing to even qualify for the waiver; and third, they must contend with a waiver process that is critically flawed (e.g., it is based upon nebulous standards imposing on the applicant the responsibility of disproving a negative in order to overcome a presumption) and entirely dependent on the discretion of either the consular officer or a CBP official.

For the foregoing reasons, Plaintiffs are likely to prevail on their due process argument.

### 3.   Plaintiffs and Proposed Class Members Will Suffer Irreparable Harm Absent This Court's Intervention.

Plaintiffs and proposed class members face more than simply the "possibility of irreparable harm." *Winter,* 555 U.S. at 22. Rather, they are able to demonstrate the likelihood of immediate, concrete, irreparable harm absent this Court's intervention. *See Leiva-Perez v.*

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611

*Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011) (holding that "separation from family members, medical needs, and potential economic hardship" are important irreparable harm factors) (internal quotation marks omitted); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (stating that "the deprivation of constitutional rights unquestionably constitutes irreparable injury") (quotation marks omitted); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006) ("[W]here a movant alleges a violation of the Establishment Clause, this is sufficient, without more, to satisfy the irreparable harm prong for purpose of the preliminary injunction determination.").

Defendants' decision to suspend adjudication and issuance of immigrant visas will cause immediate, irreparable harm to Plaintiffs and proposed class members who are parents, spouses, and children who seek to bring their family members to live with them in the United States, as well as employers in a competitive environment and professionals sought by U.S. companies. *See*, *e.g.*, Omar Decl. ¶12-14 (U.S. citizen separated from three children); Fischer Decl. ¶9 (U.S. citizen unable to live together with her husband); Dkt. 11 ¶6 (U.S. citizen facing additional delays in adjudication of his wife's immigrant visa after two and a half years of waiting); Dkt. 17 ¶6 (LPR being prevented from reuniting with his wife and seven-month-old baby); Dkt. 14 ¶¶16-18 (LPR mother facing potentially indefinite separation from son in war-torn Syria); Dkt. 25. ¶13-14 (U.S. citizen mother facing uncertain separation from seven-year-old son in Somalia).

Plaintiffs and proposed class members will face harm from immediate and ongoing discrimination and constitutional violations. *See supra* Section III.B.2; *cf.* Omar Decl. ¶18 ("We are Muslims. . . . We have the right to be with our families too."); Dkt. 11 ¶8 ("[A]s a citizen, I am concern[ed] about my constitutional rights. . . ."); Dkt. 25 ¶13 ("How do you tell a 7-year-old little boy that, 'no, you cannot come to live with your father, little sister and mother because you have a passport of a certain country?'"). They will suffer stress, emotional trauma, and dangerous living conditions. *See*, *e.g.*, Omar Decl. ¶16 (stating he "could not sleep for two nights" after learning of EO2); Fischer Decl. ¶9 (considering need to "abandon [her] life" in the

United States due to family separation); Dkt. 11 ¶8 (detailing inability to focus and "trouble sleeping" and expressing concern for his wife, who lives alone in Sudan); Dkt. 14 ¶¶10, 15-17 (expressing concern for her son's safety the longer he remains in Syria, because the "situation in Syria is so unstable that my son has even been kidnapped"). They will face increased financial burdens, due to managing multiple households and deprivation of academic and professional opportunities. *See, e.g.*, Omar Decl. ¶¶15-16; Oskouian Decl. ¶¶11-12; Dkt. 11 ¶9; Dkt. 17 ¶7; Dkt. 14 ¶10. Not least, they face the prospect of a prolonged, potentially indefinite separation from their family members, including those who are sick or in danger in their current locations. *See, e.g.*, Omar Decl. ¶17; Oskouian Decl. ¶12; Dkt. 11 ¶¶3, 10; Dkt. 17 ¶¶3-4, 7; Dkt. 14 ¶16 (explaining that "everyday" she lives with the fear of "not knowing if [she] will ever see [her] child again"); *see also* Dkts. 12-13, 15-16, 18-24 (detailing harm faced by U.S. citizens, LPRs, and businesses due to separation from family members and employees when EO1 was in effect).

These harms are not negated by the fact that Plaintiffs and proposed class members have applied for but not yet received visas. Pursuant to EO2, Defendants are suspending the adjudication and issuance of immigrant visas, thus prolonging and increasing the harm that Plaintiffs and proposed class members experience based on family separation. *See* EO2 § 5 (setting out a process for identifying and adopting additional vetting procedures for visa adjudications). Absent the EOs, Plaintiffs' and proposed class members' cases could move forward with interviews, written submissions, and adjudication. *See, e.g.*, Omar Decl. ¶11 (interview scheduled for March 13, 2017); Fischer Decl. ¶ 7 (interview already conducted); Oskouian Decl. ¶8 (interview scheduled for March 21, 2017).

Nor does the allegedly limited length of the visa issuance and entry ban alleviate the irreparable harm Plaintiffs and proposed class members face. Even delays of months are critical where parents are separated from children or couples are separated, especially where children or spouses are stranded in war-torn countries where their very safety is in constant jeopardy. Moreover, the "temporary pause," EO2 § 1(f), in visa issuance is likely to last far longer than 90

MOT. FOR TRO AND PRELIM. INJ.
Case No 2:17-cv-00135-JLR                                   21

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611

days. EO2 provides for a potentially indefinite ban on entry and visa issuance. *See* Section II; *see also* Dkt. 52 ¶¶74-83. The risk of an indefinite ban is especially grave for nationals of countries without a fully functioning central government, such as Libya, Somalia, Syria, and Yemen, or without diplomatic relations with the United States, such as Iran and Syria, for whom it would be challenging to respond to Defendants' requests for information. *Id*. Notably, while EO2's 120-day suspension of the Refugee Admissions Program includes mandatory language resuming processing after 120 days, *see* EO § 6 (providing that refugee travel and adjudication of certain refugee applications "shall resume" after 120 days), § 2(c) contains no similar language regarding mandatory resumption of visa adjudication and issuance. Such additional, potentially indefinite, delay in the adjudication of their immigrant visa applications will result in irreparable harm to the named Plaintiffs and proposed class members, prolonging their separation from family members, safety, healthcare, and professional opportunities.

Finally, the "waiver" provision included in EO2 does not alleviate or make less immediate the harm to Plaintiffs and proposed class members. Even if some ambiguous, discretionary waiver is granted to some applicants, those applicants will still have experienced further delay and separation. In addition, there is no guarantee or even likelihood that all or most will be granted the waiver. *See supra* Section II; *see also Washington*, 2017 U.S. App. LEXIS, at *33 (criticizing EO1 "waiver" for failing to explain "how would the 'national interest' be determined, who would make that determination, and when?"). Ultimately, a separate and unequal system for visa applications based on discriminatory motive will still cause irreparable harm as the result of constitutional violations. *See supra* Sections III.A.1. b, c, d.

It is well recognized that the types of harm Plaintiffs and proposed class members will experience are of an irreparable nature so as to warrant a grant of preliminary injunctive relief. *See, e.g.*, *Chalk v. U.S. Dist. Court Cent. Dist. of California*, 840 F.2d 701, 709-10 (9th Cir. 1988) (holding that "emotional and psychological" injury, including injury arising from discriminatory treatment, can constitute irreparable harm); *Arizona Dream Act Coalition v.*

*Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (holding that "intangible injuries . . . [which] generally lack an adequate legal remedy" and loss of opportunity to pursue professional advancement can constitute irreparable harm). This Court already has recognized that adverse effects on "employment, education, business, family relations, and freedom of travel" are factors relevant to the question of whether "immediate and irreparable injury" is probable. *Washington*, 2:17-cv-141-JLR, Dkt. 52 at 4 (TRO). Preliminary injunctive relief is thus appropriate.

### 4.   The Public Interest and Balance of Equities Weigh Heavily in Favor of Granting Injunctive Relief.

The public interest and balance of equities factors "merge" when, as in this case, the government is a party. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Regardless, both factors strongly favor Plaintiffs and proposed class members. If the Court does not provide immediate injunctive relief, Plaintiffs and the proposed class will continue to suffer irreparable harm, including the ongoing violation of their statutory and constitutional rights, separation from their families, emotional trauma, untenable financial burdens, and deprivation of medical and familial care. *See supra* Section III.B.3. Furthermore, EO2 includes provisions that are likely to extend the unlawful visa ban under certain circumstances, potentially prolonging these harms indefinitely. *See id*.

What Plaintiffs and proposed class members seek—that Defendants follow the lawful visa adjudication and issuance process and lawfully adjudicate applications for admission for those who obtain validly approved immigrant visas after March 16, 2017—would cause no countervailing harm whatsoever; indeed, it would be in the public interest. Defendants alleged that the ban is need for national security reasons, but they already require proposed class members to undergo extensive security screening before making individual visa issuance decisions. *See* Dkt. 52 ¶¶38-43.[41] While EO2 states that "the risk of erroneously permitting entry of a national" of the six countries who seeks to harm the United States is "unacceptably high,"

---

[41]     *See generally* Brief of Amici Curiae Former Consular Officials in Support of Respondent, *Kerry v. Din*, 135 S. Ct. 2128 (2015).

MOT. FOR TRO AND PRELIM. INJ.
Case No 2:17-cv-00135-JLR                              23

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611

Defendants still have not identified evidence to support the claims or proof that the current vetting processes, administered by the U.S. government are insufficient.[42] Indeed, current and former employees of Defendants have stated that EO1 had *no* plausible basis and was likely ineffective. *See* Section II; Dkt. 52 ¶¶99-104. The ban does not have a legitimate purpose; even the evidence available prior to discovery indicates that this iteration of the ban, like EO1, is motivated by discriminatory animus. *See* Section III.B.2.b.

Instead of protecting the United States, the EOs will cause Defendants to unlawfully separate families and unconstitutionally discriminate on the basis of religion and national origin. *See* Section III.B.2.b. The Ninth Circuit "agree[s] . . . that it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (quotation omitted); *see also Washington*, 2017 U.S. App. LEXIS 2369, at *34 (noting public interest "in avoiding separation of families, and in freedom from discrimination"); *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011) ("[T]he public interest favors applying federal law correctly."); *Rodriguez v. Robbins*, 715 F.3d 1127, 1146 (9th Cir. 2013) ("[T]he public interest . . . benefits from a preliminary injunction that ensures that federal statutes are construed and implemented in a manner that avoids serious constitutional concerns.").

Thus, the balance of equities and public interest sharply favor Plaintiffs and proposed class members. As such, preliminary injunctive relief is warranted.

## III.   <u>CONCLUSION</u>

Plaintiffs and proposed class members have demonstrated that they satisfy the required criteria for a TRO and preliminary injunction. Accordingly, the Court should grant this motion.

Dated this 10th day of March, 2017.

---

[42]    Despite criticism from federal courts that Defendants "pointed to no evidence that any alien from any of the countries named in the [EO1] has perpetrated a terrorist attack," *Washington*, 2017 U.S. App. LEXIS 2369, *32, this iteration of the EO still fails to identify the requested evidence. EO2 references only one individual originally from a targeted country, a U.S. citizen who originally entered this country as a child refugee and "was sentenced" for "attempting to use a weapon of mass destruction." EO2 at § 1(h). But it does not indicate that an allegedly temporary ban on entry from the six countries, or even new standards or document requirements for visa adjudication, *see* EO2 § 2(a), (c), would have had any impact on the entry of such a child refugee.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611

Respectfully submitted,

s/Matt Adams
Matt Adams, WSBA No. 28287

s/Glenda Aldana
Glenda M. Aldana Madrid, WSBA No. 46987

s/Maria Lucia Chavez
Maria Lucia Chavez, WSBA No. 43826

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611
(206) 587-4025 (fax)

s/Trina Realmuto
Trina Realmuto, admitted *pro hac vice*

s/Kristin Macleod-Ball
Kristin Macleod-Ball*, admitted *pro hac vice*

NATIONAL IMMIGRATION PROJECT
OF THE NATIONAL LAWYERS GUILD
14 Beacon Street, Suite 602
Boston, MA 02108
(617) 227-9727
(617) 227-5495 (fax)

s/Mary Kenney
Mary Kenney, admitted *pro hac vice*

s/Aaron Reichlin-Melnick
Aaron Reichlin-Melnick, admitted
*pro hac vice*

s/Melissa Crow
Melissa Crow, admitted *pro hac vice*
AMERICAN IMMIGRATION COUNCIL
1331 G Street, NW, Suite 200
Washington, D.C. 20005
(202) 507-7512
(202) 742-5619 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for all Defendants.  With respect to new Defendants U.S. Customs and Border Protection and the Attorney General, current counsel for Defendants, Stacy Young, has advised that she will not accept service for the agency. Therefore, along with a copy of the amended complaint and second motion for class certification, I arranged for *personal delivery* of these documents and corresponding proposed orders to:

United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271

as well as the mailing of these documents by *U.S. certified mail* to:

U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

and

U.S. Customs and Border Protection
Office of the Chief Counsel
1300 Pennsylvania Avenue, N.W.
Washington, DC 20229

Executed in Seattle, Washington, on March 10, 2017.

s/ *Matt Adams*
Matt Adams, WSBA No. 28287
Northwest Immigrant Rights Project
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611
(206) 587-4025 (fax)