UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JUWEIYA ABDIAZIZ ALI, *et al.*,

Plaintiffs,

v.

DONALD TRUMP, President of the United States, *et al.*,

Defendants.

Case No. 2:17-cv-00135-JLR

**DEFENDANTS' OPPOSITION TO EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

Consistent with the Executive's broad constitutional authority over foreign affairs and national security, Sections 1182(f) and 1185(a) of Title 8 expressly authorize the President to restrict or suspend entry of any class of aliens when in the national interest. Exercising that authority, the President issued Executive Order No. 13,780 (Order), which, *inter alia*, temporarily suspends entry of certain foreign nationals from six countries that Congress and the previous Administration determined pose a heightened terrorism risk. 82 Fed. Reg. 13,209 (2017). Those suspensions apply only for a short period, to enable the new Administration to review the Nation's

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

1

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

screening and vetting procedures to ensure that they adequately detect terrorists.  For the past 30 years, every President has invoked his power to protect the Nation by suspending entry of categories of aliens.  As a legal matter, the Order is no different.

The Order takes effect on March 16, 2017 and revokes Executive Order No. 13,769 ("Revoked Order"), which was issued on January 27, 2017.  After the Ninth Circuit declined to stay a nationwide injunction against the Revoked Order, the President decided to issue a new Order to address the Court's concerns rather than engage in protracted litigation.  The Order applies only to aliens outside the United States who do not have a visa—that is, individuals who "ha[ve] no constitutional rights regarding" their admission. *Landon v. Plasencia*, 459 U.S. 21, 32 (1982). Even as to them, the Order includes a comprehensive waiver process to mitigate any undue hardship.  The Order also eliminates any preference for religious minorities.

Despite these revisions, plaintiffs ask this Court for extraordinary relief at an extraordinary pace.  They seek a preliminary injunction or temporary restraining order enjoining the Order in its entirety, and—although they did not file their motion until March 10—they insist that this relief is urgently required before the Order takes effect on March 16.  But no immediate upheaval occurs as a result of the new Order taking effect on that date:  No identifiable plaintiff's visa will be revoked; visa processing will not halt; the unadmitted, non-resident alien plaintiffs have already been waiting for at least months for a visa, as have their petitioner relatives in the United States; and all visa applicants will have the opportunity to apply for a waiver.  The plaintiffs' request that the Court take the extraordinary step of enjoining an exercise of the President's authority to make determinations regarding national security and admissibility can and should await more deliberate presentation by the parties and less hurried consideration by the Court.

In any event, in light of these and other changes, plaintiffs have not and cannot meet their

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

2

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

heavy burden to justify the extraordinary remedy they seek. First, plaintiffs' claims are not justiciable. The nonresident, unadmitted alien plaintiffs are not entitled to judicial review, and their petitioning relatives in the United States cannot demonstrate any cognizable injury fairly traceable to the Order until their alien relatives have been denied a waiver. Second, plaintiffs' claims fail on the merits. Two separate provisions of the immigration laws grant the President broad authority plainly encompassing the Order's temporary entry suspension. The Order is completely neutral with respect to religion. Finally, plaintiffs have not demonstrated the other factors necessary for emergency relief, including the requirement of immediate, irreparable harm. Instead, the proper course of action here is for plaintiffs to seek a waiver an, if denied, to attempt to bring as-applied challenges then on a more developed record. Indeed, that record would help show whether the Order in fact causes harm to plaintiffs, which at this point is speculative. There is, however, no basis to restrain the Order in the interim, and certainly no basis to restrain it as applied to the putative nationwide class of as-yet unidentified individuals. For these reasons, plaintiffs' request for emergency relief should be denied.

## II.     BACKGROUND

### III.     STATUTORY BACKGROUND

The Immigration and Nationality Act, 8 U.S.C. §§1101 *et seq.*, governs admission of aliens into the United States. Admission (aside from certain individuals, such as some lawful permanent residents) generally requires a valid immigrant or nonimmigrant visa (or another entry document, such as a refugee travel document). *Id.* §§1181, 1182(a)(7)(A)(i), (B)(i)(II), 1203. The process of obtaining a visa under the INA typically includes an in-person interview and results in a decision by a State Department consular officer. *Id.* §§1201(a)(1), 1202, 1204. Eligibility for a visa depends on many factors, including nationality. *See*, *e.g.*, *id.* §§1184(e), 1735.

Congress has established a Visa Waiver Program (Program) that enables certain nationals

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

3

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

of participating countries to seek temporary admission for tourism or certain business purposes without a visa. 8 U.S.C. §§1182(a)(7)(B)(iv), 1187. In 2015, however, Congress excluded from the Program individuals from Program-participating countries who have connections with specific non-Program countries. *Id.* §1187(a)(12). Congress itself specifically excluded nationals of countries participating in the Program who are dual nationals of or had recently visited Iraq or Syria, where "[t]he Islamic State of Iraq and the Levant (ISIL) . . . maintain[s] a formidable force," and nationals of and recent visitors to countries designated by the Secretary of State as state sponsors of terrorism (currently Iran, Sudan, and Syria).[1] 8 U.S.C. §1187(a)(12)(A)(i)-(ii). Congress also authorized the Department of Homeland Security (DHS) to designate additional countries of concern, considering whether a country is a "safe haven for terrorists," "whether a foreign terrorist organization has a significant presence" in the country, and "whether the presence of an alien in the country . . . increases the likelihood that the alien is a credible threat to" U.S. national security, *id.* §1187(a)(12)(D)(i)-(ii), and in February 2016 DHS excluded recent visitors to Libya, Somalia, and Yemen, noting that the designation was "indicative of the Department's continued focus on the threat of foreign fighters."[2] In short, Congress and the prior Administration determined that the conditions in these seven countries warranted individualized review in admitting aliens into our Nation's borders.

Critically, although Congress created various avenues to admission, it accorded the Executive broad discretion to restrict or suspend admission of aliens. First, Section 1182(f) provides:

Whenever the President finds that the entry of any aliens or of any class of aliens into

---

[1] U.S. Dep't of State, *Country Reports on Terrorism* 6 (2016), https://www.state.gov/documents/organization/258249.pdf.

[2] https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program.

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

4

the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

Second, Section 1185(a)(1) makes it unlawful for an alien to enter or attempt to enter the country "except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe."

## IV. THE REVOKED ORDER

On January 27, 2017, the President issued Executive Order No. 13,769 (the "Revoked Order"), which will be revoked by Executive Order No. 13,780 at 12:01 a.m. on March 16, 2017. It directed the Secretaries of Homeland Security and State to assess current screening procedures to determine whether they were sufficient to detect individuals who were seeking to enter this country to do it harm. Revoked Order § 3(a)-(b). While that review was ongoing, the Revoked Order suspended for 90 days entry of foreign nationals of the seven countries already identified as posing heightened terrorism-related concerns in the context of the Visa Waiver Program. *Id.* § 3(c). It authorized the Secretaries, however, to make case-by-case exceptions to the suspension. *Id.* § 3(g).

The Revoked Order similarly directed a review of the Refugee Program, and, pending that review, suspended entry under the Program for 120 days, subject to case-by-case waivers. Revoked Order §5(a), (c). It also suspended admission of Syrian refugees until the President determined "that sufficient changes have been made to the [Refugee Program] to ensure that admission of Syrian refugees is consistent with the national interest." *Id.* §5(c). Finally, it sought to assist victims of religious persecution by directing agencies to prioritize refugee claims premised on religious-based persecution, provided the religion at issue was "a minority religion in the individual's country of nationality." *Id.* §5(b).

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

5

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

## V. LITIGATION CHALLENGING THE REVOKED ORDER

The Revoked Order was challenged in multiple courts. The State of Washington filed suit in this Court, seeking a TRO against Sections 3(c), 5(a)-(c), and 5(e). *Washington v. Trump*, No. 17-41 (W.D. Wash.). On February 3, 2017, this Court enjoined those provisions nationwide. 2007 WL 462040 (W.D. Wash. Feb. 3, 2017). On February 9, after accelerated briefing and argument, the Ninth Circuit declined to stay the injunction pending appeal. *Washington v. Trump*, 847 F.3d 1151, 1156 (9th Cir. 2017) (per curiam). Although acknowledging that the injunction may have been "overbroad," the court declined to narrow it, concluding that "[t]he political branches are far better equipped" to do so. *Id.* at 1166-67.

## VI. THE ORDER

Responding to the Ninth Circuit's invitation, on March 6, 2017—at the joint urging of the Attorney General and Secretary of Homeland Security[3]—the President issued the Order. The Order takes effect on March 16, at which time it revokes the Revoked Order, and replaces it with substantially revised provisions that address the Ninth Circuit's concerns.

The Order's central, explicit purpose is to enable the President and his Administration to assess whether current screening and vetting procedures are sufficient to detect terrorists seeking to infiltrate the Nation. Order § 1(f). To facilitate that important review, the President ordered a temporary, 90-day pause on entry of certain foreign nationals from six nations previously "identified as presenting heightened concerns about terrorism and travel to the United States" by Congress or the prior Administration: Iran, Libya, Somalia, Sudan, Syria, and Yemen. *Id.* § 1(a), (d)-(f).

---

[3] Joint Ltr. to President (Mar. 6, 2017), https://www.dhs.gov/sites/default/files/publications/17_0306_S1_DHS-DOJ-POTUS-letter-0.pdf (Ex. A).

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

6

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

## A. Temporary suspension of entry by certain aliens from six countries

As the Order explains, each of those countries "is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones," which is why Congress and the Secretary of Homeland Security previously designated them "countries of concern." Order §1 (d). The Order details the circumstances of each country that give rise to "heightened risk[s]" that terrorists from those countries would attempt to enter the United States and that those countries' governments may lack the "willingness or ability to share or validate important information about individuals seeking to travel to the United States" to screen them properly.

To that end, the Order "suspend[s] for 90 days" the "entry into the United States of nationals of those six countries." Order §2 (c). In response to the Ninth Circuit's ruling, however, the Order clarifies that the suspension applies only to aliens who: (1) are outside the United States on the Order's effective date, (2) do not have a valid visa on that date, and (3) did not have a valid visa on the effective date of the Revoked Order. Order §3 (a). It expressly excludes other categories of aliens that concerned the Ninth Circuit, including (among others) any lawful permanent resident; any foreign national admitted to or paroled into the United States; any individual with a document other than a visa permitting travel to the United States; and any foreign national granted asylum, any refugee already admitted to the United States, or any individual granted certain protections from removal. *See id.* § 3(b).

## B. Case-by-case waivers

The Order also contains a detailed waiver provision. Order § 3(c). It permits consular officials (and the Commissioner of U.S. Customs and Border Protection or his delegee Commissioner) to grant case-by-case waivers where denying entry "would cause undue hardship" and "entry would not pose a threat to national security and would be in the national interest." *Id.*

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

7

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

Moreover, it lists circumstances where waivers could be considered, including for (among others):

- foreign nationals who were previously "admitted to the United States for a continuous period of work, study, or other long-term activity," but who are currently outside the country and seeking to reenter;

- individuals who seek entry for "significant business or professional obligations"; and

- individuals who seek entry "to visit or reside with a close family member (e.g., a spouse, child, or parent) who is a U.S. citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa."

*Id.* These provisions providing examples of instances where a waiver may be warranted.

Finally, the Order specifies that requests for waivers will be processed "as part of the visa issuance process." Order §3 (c); *see also* U.S. Dep't of State, *Executive Order on Visas* (Mar. 6, 2017), https://travel.state.gov/content/travel/en/news/important-announcement.html (Ex. B). Consular officers reviewing visa applications, assuming the applicant is otherwise found eligible for the visa, will carefully review each waiver request under these criteria.

## VI. DISMISSAL OF THE NINTH CIRCUIT APPEAL, AND PLAINTIFFS' AMENDED COMPLAINT AND EMERGENCY MOTION FOR INJUNCTIVE RELIEF

In light of the Order, on March 7, 2017, the government filed a motion to dismiss its appeal of this Court's preliminary injunction in *Washington v. Trump*, which the Ninth Circuit granted on March 8. Plaintiffs, who initially filed suit on January 31, thereafter then on March 10, amended their complaint, filed a second motion to certify a class (some named plaintiffs were added and others were removed from the original putative class),[4] and moved to enjoin Sections 1(f), 2 and

---

[4] Plaintiffs now seek to certify the following class:
All nationals of countries designated by Section 2 of the Executive Order 13780 (currently Iran, Libya, Syria, Somalia, Sudan, and Yemen) who have applied for or will apply for an immigrant visa and the visa petitioners for those nationals; whose visa application adjudication has been or will be suspended or denied, or who have been or will be denied the ability to seek

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

8

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

3 of the Order, and Section 3(c) of the Revoked Order.[5]

The plaintiffs are either (1) family-based immigrant visa petitioners in the United States or (2) beneficiaries of an approved, family-based immigrant visa petition who are allegedly nationals of one of the designated countries and are applying for or intending to apply for an immigrant visa at a U.S. embassy or consulate overseas. To obtain a family-based immigrant visa, a U.S. citizen or lawful permanent resident (LPR) must file a visa petition (Form I-130), usually in the United States. *See* 8 U.S.C. 1154(a)(1). If all the relevant requirements are satisfied, the overseas alien who is the beneficiary of an approved petition may apply for a visa. *See* 8 U.S.C. § 1201(a); 8 U.S.C. § 1202(a). An alien visa applicant located outside the United States must appear at a U.S. consulate for an in-person interview with a consular officer in the Department of State. *See* 8 U.S.C. § 1202(h). The decision to grant or deny a visa application rests with the consular officer. *See* 8 U.S.C. § 1201(a)(1). *See* 8 U.S.C. § 1201(a)(1). Neither the approval of a visa petition nor the issuance of an immigrant visa guarantees admission to the United States. *See* 8 U.S.C. §§ 1154(e), 1201(h). That decision rests with the DHS immigration officer following inspection of the alien at a U.S. port of entry.

The 10 named plaintiffs include six aliens currently outside the United States, each of whom is an unadmitted national of one of the six identified countries, and none of whom have received a visa (collectively, "alien plaintiffs"). Each of the remaining plaintiffs (collectively,

---

entry into and/or enter the United States, on the basis of Executive Order 13780.

Amended Complaint (Am. Compl.) ¶ 164. Indeed, plaintiffs cannot represent this class because they cannot yet show that their visa applications have been "suspended or denied" based on the Order.

[5] Plaintiffs' challenge to the Revoked Order will be moot as of March 16. Order at §§ 13, 14.

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]                    9

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

"petitioner plaintiffs") resides in the United States and filed an immigrant visa petition, as a parent or a spouse, on behalf of at least one of the alien plaintiffs. These plaintiffs include two U.S. citizens and two LPR petitioners.[6]

Of the six alien plaintiffs, three have not yet applied for a visa. *See* Exhibit, Declaration of Chloe Dybdahl ("Ex."). The other three applied for immigrant visas but their applications were refused under 8 U.S.C. § 1201(g) on March 13, 2017, for reasons that include failing to provide proof of a relationship with the petitioner. *Id.*

## VII.    STANDARD OF REVIEW

Emergency relief is "an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008). The movant "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that [a TRO] is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Injunctive relief that "deeply intrudes into the core concerns of the executive branch"—including foreign affairs and national security—may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams v. Vance*, 570 F.2d 950, 954-55 (D.C. Cir. 1978).

## VIII.    ARGUMENT

Plaintiffs do not meet their extraordinary burden. At the outset, they present no justiciable claims at all. As explained above, the Order applies only to individuals outside the country who do not have a current visa, and even as to them, it sets forth robust waiver provisions. Plaintiffs, therefore, either lack standing or their claims are unripe. Moreover, plaintiffs' claims fail on the merits. The Order falls well within the President's statutory authority and addresses the

---

[6]    Although plaintiffs refer to U.S.-based employers as proposed class members, none is listed as a named plaintiff. Thus, under Federal Rule of Civil Procedure 23(a), no such employers are parties to the lawsuit at this time.

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

10

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

constitutional concerns identified by federal courts. Plaintiffs therefore are not entitled to the sweeping relief they seek.

## I. PLAINTIFFS' CHALLENGES TO THE ORDER ARE NOT JUSTICIABLE

All of plaintiffs' claims fail because they lack Article III standing or their claims are not yet ripe. Plaintiffs must demonstrate a "legally and judicially cognizable" injury, *Raines v. Byrd*, 521 U.S. 811, 819 (1997), consisting of, at minimum, a "concrete and particularized" injury caused by the Order that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Moreover, "standing is not dispensed in gross. Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008). They have not done so.

First, the doctrine of consular nonreviewability has long provided that an alien abroad cannot obtain judicial review of the denial of a visa. *See Brownell v. Tom We Shung*, 352 U.S. 180, 184 n.3, 185 n.6 (1956); *Cardenas v. United States*, 826 F.3d 1164, 1169 (9th Cir. 2016) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792, 794-95 (1977)). The Ninth Circuit has recognized a "limited exception" to that doctrine "where the denial of a visa implicates the constitutional rights of American citizens." *Cardenas*, 826 F.3d at 1169. But most of plaintiffs' claims—and all of the alien plaintiffs' claims—fall outside that limited exception and are therefore foreclosed by the doctrine of nonreviewability.

Second, it is likewise well-established that there is no standing based on the purported injury of a delay in visa decision-making. *See, e.g., Catholic Charities CYO v. Chertoff*, 622 F. Supp. 2d 865, 878-80 (N.D. Cal. 2008) (holding no standing and that claims were unripe); *Kodra v. Sec'y, Dep't of State*, 903 F. Supp. 2d 1323, 1327 (M.D. Fla. 2012) (no standing to challenge delay of visa determination). Here, however, that is precisely what plaintiffs complain of: they seek to challenge the Order's temporary, 90-day suspension on entry, which is subject to waivers

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

11

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

even during that brief period.  For this reason, as well, plaintiffs lack standing.

Third, even if the petitioner plaintiffs had standing, their claims are not ripe.  "The doctrine[] of . . . ripeness . . . originate[s] in Article III's 'case' or 'controversy' language, no less than standing does." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 351 (2006).  Ripeness ensures that courts "avoid[] . . . premature adjudication," particularly where future agency decision-making or factual determinations may change the character of the controversy or obviate the need for judicial relief altogether.  *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003).

Here, the facts as pleaded demonstrate that each of the petitioner plaintiffs' claims are unripe.  The petitioner plaintiffs' relatives in the designated countries are all individuals for whom the Order specifically contemplates the possibility of a waiver.  *See* Order §§ 3(c)(iv), 6(c).  It is therefore possible that every alien plaintiff—if each is found otherwise eligible for the visa—will obtain such a waiver as part of the visa application process.  Unless and until the alien plaintiffs are denied a visa, their ability or inability to enter—and thus the petitioner plaintiffs' claimed injury—"rests upon 'contingent future events.'" *Texas v. United States*, 523 U.S. 296, 300 (1998).

Plaintiffs attempt to demonstrate standing based on alleged injury under the Establishment Clause, but they similarly fail to meet their burden.  Although "the concept of injury for standing purposes is particularly elusive in Establishment Clause cases," a plaintiff cannot establish standing without showing a personal injury resulting from the alleged violation of the Establishment Clause.  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 485-86 (1982) (plaintiffs lacked standing because they "fail[ed] to identify any personal injury suffered by them . . . other than the psychological consequence presumably produced by observation of conduct with which one disagrees").  Plaintiffs, rather, must demonstrate a "particular and concrete injury to a personal constitutional right."  *Id.* at 482.

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

12

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

This, for example, could include a "direct harm of what is claimed to be an establishment of religion, such as a mandatory prayer in a public school classroom," or that Plaintiffs "have incurred a cost or been denied a benefit on account of their religion," which, for example, "can result from alleged discrimination in the tax code, such as when the availability of a tax exemption is conditioned on religious affiliation." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133-34 (2011); *see also Freedom from Religion Found., Inc. v. Lew*, 773 F.3d 815, 820-21 (7th Cir. 2014); *Catholic League for Religious & Civ. Rights v. City & Cnty. of San Francisco*, 624 F.3d 1043, 1049-50 (9th Cir. 2010) (en banc).

Plaintiffs make neither showing here. First, they cannot demonstrate "direct harm" because the Order does not require Plaintiffs to "see or do anything." *Lew*, 773 F.3d at 820; *see Newdow v. Lefevre*, 598 F.3d 638, 641 (9th Cir. 2010); *see also Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1016 (9th Cir. 2010) (same plaintiff lacked standing to challenge the pledge of allegiance because he had sustained no personal injury where "nothing in the Pledge [or the statute codifying it] actually requires anyone to recite it"). In other words, the Order does not "convey[] a government message of disapproval and hostility toward their religious beliefs" that causes them to change their behavior by, for example, "forcing them to curtail their political activities . . . ." *Catholic League*, 624 f.3d at 1053.

Likewise, plaintiffs cannot show they have incurred a cost or been denied a benefit on account of their religion. No benefit has been denied—indeed, each alien plaintiff is still in visa processing, which has not been halted under the Order. *See, e.g.*, *Lew*, 773 F.3d at 821 (rejecting standing where "the plaintiffs were never denied the parsonage exemption because they never asked for it"). Indeed, given the comprehensive waiver process established by Section 3(c) of the Order, plaintiffs' claims with respect to aliens seeking entry or a visa in the *future* are entirely

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

13

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

speculative and therefore not ripe under Article III in the first place. *See, e.g.*, *Suhre*, 131 F.3d at 1091 (discussing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-06 (1983) and rejecting Establishment Clause injury premised on "untenable assumptions" about *future* events); *Lew*, 773 F.3d at 821 ("A plaintiff cannot establish standing to challenge such a provision without having personally claimed and been denied the [religious] exemption.").

## II. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

### A. The Order Is A Valid Exercise Of The President's Authority

Even if plaintiffs' challenges to the Order were justiciable, they would not warrant emergency relief because none is likely to succeed. The Order's temporary suspension of entry of certain classes of aliens during a review of the Nation's screening and vetting procedures is a valid exercise of the President's broad statutory authority to "suspend the entry of any aliens or of any class of aliens" (Section 1182(f)) and to prescribe the terms on which aliens may enter (Section 1185(a)(1)). Yet, Plaintiffs contend that 8 U.S.C. § 1152(a)(1) should be construed as an implied repeal of those authorities. No court has accepted that argument, which misreads the relevant statutes.

### 1. The Order falls squarely within the President's broad authority under Sections 1182(f) and 1185(a)

"'[T]he power to exclude aliens is inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of the government.'" *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972). Congress, moreover, has conferred expansive authority on the President, including in two statutory provisions that the Order expressly invokes. Order § 2(c).

First, Section 1182(f) provides that "[w]henever the President finds that the entry of any

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]                    14

U.S. Department of Justice
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or of any class of aliens as immigrants or nonimmigrants," or "impose on the entry of aliens any restrictions he deems to be appropriate." "The President's sweeping proclamation power [under Section 1182(f)] provides a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the [inadmissibility] categories in section 1182(a)." *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987); *see Mow Sun Wong v. Campbell*, 626 F.2d 739, 744 n.9 (9th Cir. 1980) (explaining that Section 1182(f) "specifically grants the President, where it is in the national interest to do so, the extreme power to prevent the entry of any alien or groups of aliens into this Country."). Every President over the last thirty years has invoked that authority to suspend or restrict entry of certain classes of aliens.[7]

Second, Section 1185(a) broadly authorizes the "President" to "prescribe" reasonable "rules, regulations, and orders," and "limitations and exceptions" regarding entry of aliens. That provision is the latest in a line of statutory grants of authority tracing back nearly a century. *See* Pub. L. No. 65-154, §1(a), 40 Stat. 559 (1918). Originally limited to times of war or declared national emergency, Congress removed that limitation in 1978, when it enacted Section 1185(a) in its current form. Pub. L. 95-426, §707(a), 92 Stat. 963, 992-93 (1978).

Both of those provisions comfortably encompass the Order's temporary suspension of entry of aliens from six countries that the President—in consultation with the Attorney General

---

[7]  *See, e.g.*, Proclamation 5517 (1986) (Reagan; Cuban nationals); Exec. Order No. 12,807 (1992) (George H.W. Bush; government officials who impeded anti-human-trafficking efforts); Proclamation 8342 (2009) (George W. Bush; same); Proclamation 6958 (1996) (Clinton; Sudanese government officials and armed forces); Proclamation 8693 (Obama; aliens subject to U.N. Security Council travel bans).

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

15

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

and the Secretaries of State and Homeland Security—concluded required special precautions while the review of existing screening and vetting protocols is completed. That temporary measure is a paradigmatic exercise of the President's authority to "suspend the entry" of "any class of aliens" he finds may be "detrimental to the interests of the United States," 8 U.S.C. § 1182(f), and to prescribe "limitations" and "exceptions" on entry, *id.* § 1185(a)(1).

### 2. Section 1152 does not restrict the President's broad authority under Sections 1182(f) and 1185(a)

Plaintiffs contend (Mot. at 9-13) that Section 1152(a)(1)(A), which prohibits discrimination on the basis of nationality in the allocation of immigrant visas, bars the President from drawing nationality-based distinctions under Sections 1182(f) and 1185(a), notwithstanding the fact that Presidents have done just that for decades. Plaintiffs are wrong.

Even where it applies, Section 1152(a)(1)(A) does not restrict the President's authority to draw nationality-based distinctions under Sections 1182(f) and 1185(a). Section 1152(a)(1)(A) was enacted in 1965 to abolish the prior system of nationality-based quotas for immigrant visas. Congress replaced that system with uniform, per-country percentage limits. Section 1152(a)(1)(A) addresses the subject of relative "preference" or "priority" (and reciprocal disadvantage or "discrimination") in the allocation of immigrant visa numers by making clear that the uniform percentage limits are the only limits that may be placed on the number of immigrant visas issued to nationals of any country.

Section 1152(a)(1)(A) thus governs the ordinary process of allocating and granting immigrant visas. Its plain text governs only "the issuance of an immigrant visa"; it does not purport to restrict the President's antecedent, longstanding authority to suspend entry of "any class of aliens" or to prescribe reasonable "rules, regulations, and orders" regarding entry as he deems appropriate. And it has never been understood to prohibit the President from drawing nationality-

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

16

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

based distinctions under Section 1182(f).  For example, President Reagan invoked Section 1182(f) to "suspend entry into the United States as immigrants by all Cuban nationals," subject to exceptions.  Proclamation No. 5517 (1986).  *See also* Proclamation 6958 (1996) (members of Sudanese government and armed forces); Proclamation 5829 (1988) (certain Panamanian nationals); Proclamation 5887 (1988) (Nicaraguan government officers and employees).

Section 1185(a), too, has long been understood to authorize nationality-based distinctions. In 1979, the Office of Legal Counsel construed it as authorizing the President to "declare that the admission of Iranians or certain classes of Iranians would be detrimental to the interests of the United States." *Immigration Laws and Iranian Students*, 4A Op. O.L.C. 133, 140 (Nov. 11, 1979). Two weeks later, President Carter invoked Section 1185(a) to direct "limitations and exceptions" regarding "entry" of certain "Iranians."  Exec. Order No. 12,172 (1979).  It is thus simply incorrect that past Presidents have not drawn nationality-based distinctions in administering the immigration laws.  *See also*, *e.g.*, *Narenji v. Civiletti*, 617 F.2d 745, 746-748 (D.C. Cir. 1979) (upholding regulation that required nonimmigrant-alien post-secondary-school students who were Iranian natives or citizens to provide residence and immigration status to former INS).

Interpreting Section 1152(a)(1)(A) to prohibit the President from drawing these and other nationality-based distinctions would raise serious constitutional questions that the Court must avoid if possible.  *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).  As these examples illustrate, limiting the entry of nationals of particular countries can be critical to the President's ability to conduct the Nation's foreign affairs and protect its security.  Yet plaintiffs' statutory interpretation would completely disable the President from restricting the entry of immigrants from any country—even one with which the United States was on the verge of war.

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

17

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

Plaintiffs offer no sound reason to adopt that constitutionally dubious interpretation or to upset the long-settled understanding of the President's statutory authority. Plaintiffs cite one decision addressing nationality-based distinctions in another immigration context, which did not involve an exercise of the President's authority under Section 1182(f) or Section 1185(a).[8] *See* Mot. at 9. Plaintiffs are wrong that that decision reflects a general bar on nationality-based distinctions in immigration. In fact, "given the importance to immigration law of, *inter alia*, national citizenship, passports, treaties, and relations between nations, the use of such classifications is commonplace and almost inevitable." *Rajah v. Mukasey*, 544 F.3d 427, 435 (2d Cir. 2008).

Plaintiffs contend (Mot. at 11) that Section 1152(a)(1)(A) overrides the President's Section 1182(f) authority because it was enacted later in time. In fact, plaintiffs have it backwards: to read Section 1152(a)(1)(A) as narrowing the President's Section 1182(f) authority would be to treat it as a partial "'repeal[] by implication,'" which courts will not do unless Congress's "'intention'" is "'clear and manifest.'" *Nat'l Ass'n of Home Builders v. Defenders of Wildlife (NAHB)*, 551 U.S. 644, 662, 664 n.8 (2007); *see Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976). Sections 1152(a)(1)(A) and 1182(f) can, and therefore must, be reconciled by sensibly reading Section 1152(a)(1)(A)'s general, default provisions as not affecting the President's authority to suspend entry under Section 1182(f) based on a specific finding about the national interest. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2070-71 (2012) ("'[I]t is a commonplace of statutory construction that the specific governs the general.'").

---

[8]    *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 472-73 (D.C. Cir. 1995) (processing immigrant visas), *vacated on other grounds*, 519 U.S. 1 (1996); *Olsen v. Albright*, 990 F. Supp. 31 (D.D.C. 1997) (issuance of nonimmigrant visas by individual consular officers).

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]                                    18

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

Furthermore, even if Section 1152(a)(1)(A) could be construed to narrow Section 1182(f), it cannot be read to narrow Section 1185(a)—which was substantially amended in 1978, *after* Section 1152(a)(1)(A)'s enactment. Nothing in Section 1185(a)'s current text or post-1978 history limits the President's authority to restrict entry by nationals of particular countries.

## B. The Order Does Not Violate The Due Process Clause

The Order applies only to aliens who have no due-process rights in connection with their entry into this country. Plaintiffs assert the purported due-process rights of the U.S. citizen and LPR visa petitioners with respect to the entry of aliens abroad. But their claims fail for numerous reasons, including because the Order provides whatever individualized process the Constitution may require.

### 1. The plaintiffs do not have due-process rights with respect to their entry into the United States

The only persons subject to the Order are foreign nationals outside the United States with no visa or other authorization to enter this country. Order § 3(a)-(b). An "unadmitted and nonresident alien" has "no constitutional right of entry to this country," *Mandel*, 408 U.S. at 762, and "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." , 338 U.S.at 544; *see also Bustamante v. Mukasey*, 531 F.3d 1059, 1062-63 (9th Cir. 2008). Congress, with limited exception, has not provided for any judicial review of a visa refusal or revocation. *See*, *e.g.*, 6 U.S.C. § 236(f) (providing that the designation of authorities in Section 236 does not give rise to a private right of action against a consular officer to challenge a decision to grant or deny a visa); 8 U.S.C. § 1201(i) (no judicial review of visa revocation except

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR PRELIMINARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

19

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

in limited circumstances).[9]   Thus, under the firmly entrenched doctrine of consular nonreviewability and the Supreme Court law that cements its footing, the alien plaintiffs are entitled to no judicial review

## 2.   The petitioner plaintiffs' due-process claims lack merit

First, the Due Process Clause confers no entitlement on persons in the United States regarding the entry of others. *See Kerry v. Din*, 135 S.Ct. 2129, 2131 (plurality opinion) ("There is no such constitutional right.")  In a pre-*Din* decision, however, the Ninth Circuit held that a U.S. *citizen* spouse had a protected liberty interest in her husband's entry. *See Bustamante*, 531 F.3d at 1062.  But Justice Kennedy's concurring opinion in *Din* expressly reserved judgment on whether a citizen in the United States has any due-process right even with respect to entry of her spouse; he found no "need [to] decide that issue" because "the Government satisfied any" due-process "obligation it might have had." *Id.* at 2139, 2141.  There (and in *Bustamante*), the alleged due-process right was tied to the fundamental right to marry, *see* 135 S. Ct. at 2134 (plurality op.)— i.e., "a protected liberty interest in" and "freedom of personal choice in matters of marriage,"

---

[9]   Congress has repeatedly acknowledged the consular nonreviewability doctrine and chosen to leave it undisturbed.  When Congress drafted the INA in 1952, there were suggestions to authorize judicial review of visa denials or to create "a semijudicial board . . . with jurisdiction to review consular decisions pertaining to the granting or refusal of vi-sas," H.R. Rep. No. 1365, 82d Cong., 2d Sess. 36 (1952) (House Report); *see* S. Rep. No. 1515, 81st Cong., 2d Sess. 622 (1950).  But Congress declined to enact any such procedure.  Then in 1961, when the INA was amended to authorize judicial review of determinations affecting aliens in the United States subject to deportation or exclusion proceedings, Congress provided no corresponding right to judicial review for aliens outside the United States claiming some right to enter. *See* Act of Sept. 26, 1961, Pub. L. No. 87-301, § 5(a), 75 Stat. 651.  As recently as 2002, Congress made clear that the Homeland Security Amendments did not create a "private right of action to challenge a decision of a consular officer or other United States official or employee to grant or deny a visa." Homeland Security Act of 2002, Pub. L. No. 107-296, § 428(b), (e), and (f ), 116 Stat. 2187-2190.  And Congress has failed to enact numerous bills proposing to establish a board within the Department of State to review consular officers' visa decisions. *See*, *e.g.*, H.R. 3305, 103d Cong., 1st Sess. (1993); H.R. 2975, 104th Cong., 2d Sess. (1996); H.R. 4539, 105th Cong., 2d Sess. (1998); H.R. 1345, 107th Cong., 1st Sess. (2001).

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

20

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

*Bustamante*, 531 F.3d at 1062. To the extent that plaintiffs seek to assert claims based on the entry of non-spouses, or based on the rights of LPRs rather than U.S. citizens, *Din* and *Bustamante* do not support their claims. *See, e.g.*, *Santos v. Lynch*, 2016 WL 3549366, at *3-4 (E.D. Cal. June 29, 2016) (declining to extend Din to find "liberty interest an adult child to live in the United States with her parents"); *L.H.* v. *Kerry*, No. 14-06212, slip op. 3-4 (C.D. Cal. Jan. 26, 2017) (same; daughter, son-in-law, and grandson).

Second, assuming the Due Process Clause applies to the petitioner plaintiffs, their procedural due-process claims fail because they do not explain what further process the Constitution could possibly require. Of course, as we have explained, one reason for this is that their claims are premature, filed in advance of visa decisions rather than after them, as was the case in *Din* and *Mandel*. Unlike the plaintiff in *Din*,[10] the petitioner plaintiffs here do not seek additional explanation for an individualized immigration decision or contend that officials misapplied a legal standard to a particular case. Instead, they challenge the President's decision to suspend the entry of certain nationals of six countries. Plaintiffs do not and cannot claim that due process requires notice or individualized hearings where, as here, the government acts through categorical judgments rather than individual adjudications. *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 446 (1915); *Yassini v. Crosland*, 618 F.2d 1356, 1363 (9th Cir. 1980).

Third, even if some individualized process were required, the Order more than provides it through the consular review of waiver requests (part of the visa-application process), including for foreign nationals seeking to "visit or reside with a close family member." Order § 3(c)(iv); *see id.*

---

[10] To be clear, the limited judicial review described in *Din* applied to U.S. citizens petitioning on behalf of their spouses, and no court has extended it to LPRs.

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

21

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

§ 3(c)(i)-(ix).  In Justice Kennedy's concurring opinion in *Din*, the only process that he required was a notice of the decision along with a general statement of the legal basis for the decision.  135 S. Ct. at 2140–41.  The waiver process is plainly sufficient, even under this standard.  Although plaintiffs describe the waiver process as "limited" and "arduous" (Mot. at 11), they provide no support for their claim or point to any specific inadequacy in the process.  Instead, the Order establishes a waiver process that provides an avenue for individuals like the alien plaintiffs who establish that they are otherwise eligible for visas to enter the United States.  Importantly, visa processing is going to move forward after the Order goes into effect, making this not a case that involves process being available.  *See* U.S. Dep't of State, Executive Order on Visas (2016), https://www.state.gov/documents/organization/258249.pdf.  At an absolute minimum, Plaintiffs cannot claim that the Due Process Clause entitles them to emergency injunctive relief when they have not availed themselves of the process the Order provides.

## C.    The Order Does Not Discriminate Based On Religion

The Order does not discriminate on the basis of religion.  It applies to six countries that Congress and the prior Administration determined posed special risks of terrorism.  It applies to *all* individuals in those countries, regardless of their religion.  And it excludes numerous individuals with ties to this country, while providing a comprehensive waiver process for others.  Plaintiffs nevertheless try to impugn the Order using campaign statements.  As the Supreme Court has made clear, official action must be adjudged by its "'text, legislative history, and implementation of the statute or comparable official act[ion],'" not through "judicial psychoanalysis of a drafter's heart of hearts."  *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 862 (2005) (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000)).  Measured against these standards, the Order falls well within the President's lawful authority.

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

22

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

**1.   The Order draws distinctions on the basis of risk of terrorism, not religion**

Plaintiffs correctly do not contend that the Order draws "explicit and deliberate distinctions" based on religion. *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982). The only language in the Revoked Order touching on religion—a neutral provision intended to assist victims of religious persecution—has been removed. And the Order's temporary suspensions are expressly premised on the President's finding that a temporary pause in entry was necessary to "prevent infiltration by foreign terrorists" while the review of screening and vetting procedures is ongoing. Order § 2(c). The six countries covered were previously designated by Congress and the Executive Branch as presenting particular risks, and the risk of continued entry from those countries during the review was, in the President's view, unacceptably high.

The Order's stated "secular purpose" is entitled to "deference" so long as it is "genuine," *i.e.*, "not a sham, and not merely secondary to a religious objective." *McCreary*, 545 U.S. at 864. Courts judge the genuineness of the government's true "object" by considering the "operation" of its action, as "the effect of a law in its real operation is strong evidence of its object." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993). The "Establishment Clause analysis does not look to the veiled psyche of government officers," but rather to "the 'text, legislative history, and implementation of the statute,' or comparable official act." *McCreary*, 545 U.S. at 862-63. Here, the operation of both suspensions confirms the Order's stated purpose. The suspensions apply irrespective of any alien's religion, and plaintiffs do not contend otherwise.

The fact that the six countries covered by the entry suspension are predominantly Muslim in no way establishes that the suspension's object is to single out Islam. The six countries covered were previously selected by Congress and the Executive through a process that Plaintiffs do not contend was religiously motivated. In addition, those countries represent only a small fraction of

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

23

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

the world's 50 Muslim-majority nations, and are home to less than 9% of the global Muslim population.[11]  And the suspension covers *every* national of those countries, including millions of non-Muslim individuals in those countries, unless they are either excluded from its scope or entitled to a waiver based on the religiously neutral exclusion and waiver provisions.

### 2.  The Order cannot be restrained on the basis of campaign statements or the Revoked Order

Plaintiffs argue that the Order targets Islam not because of what it says or does, but because of statements by the President, mostly before he assumed office, and his surrogates.  Mot. at 1-5.  Plaintiffs cannot use either type of parol evidence to evade the Order's secular purpose.

As a threshold matter, the Supreme Court has made clear in the immigration context that courts may not "look behind the exercise of [Executive] discretion" taken "on the basis of a facially legitimate and bona fide reason."  *Mandel*, 408 U.S. at 77; *see Fiallo v. Bell*, 430 U.S. 787, 796 (1977).  That clear rule alone—which plaintiffs never address—disposes of their Establishment Clause claim.  As those cases recognize, plaintiffs' approach would thrust courts into the untenable position of probing the Executive's judgments on foreign affairs and national security.  And it would invite impermissible intrusion on Executive Branch deliberations, which are constitutionally "privilege[d]" against such inquiry, *United States v. Nixon*, 418 U.S. 683, 708 (1974), as well as litigant-driven discovery that would disrupt the President's ongoing execution of the laws, *see, e.g.*, *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982).  Searching for governmental purpose outside official pronouncements and the operative terms of governmental action is fraught with practical "pitfalls" and "hazards" that courts should avoid.  *Palmer v. Thompson*, 403 U.S. 217, 224 (1971).

---

[11]   *See* Pew-Templeton Global Religious Futures Project, Muslim Population by Country (2010), http://www.globalreligiousfutures.org/religions/muslims

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

24

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

Even if the Court could look behind the President's facially legitimate reasons for suspending the entry of certain foreign nationals and refugees, informal statements by the President or his surrogates that do not directly concern the Order are irrelevant. The Supreme Court has declined to rely even on press statements and other informal communications by *incumbent* government officials, recognizing that they may not accurately reflect the government's position. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 623-24 & n.52 (2006); *see also Professionals & Patients for Customized Care v. Shalala*, 56 F.3d 592, 599 (5th Cir. 1995). *A fortiori*, statements by private persons cannot reveal "the government's ostensible object." *McCreary*, 545 U.S. at 859-60; *see Modrovich v. Allegheny County*, 385 F.3d 397, 411-12 (3d Cir. 2004) (declining to rely on position of non-government parties); *Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1031 (10th Cir. 2008) (same); *Glassman v. Arlington County*, 628 F.3d 140, 147 (4th Cir. 2010) (same); *see also Peck.*, 155 F.3d at 281-82 (observing that the government's affirmative action or statement discouraging notion that its action has religious purpose can negate "objective observer" finding of religious intent); *ACLU of Kentucky v. Mercer County*, 432 F.3d 624, 631 (6th Cir. 2005) ("[t]he only history the objective observer would incorporate into this display is the statement of Judge McGinnis [filed after the litigation was instituted] that the purpose of the display is to recognize American legal traditions").

Using comments by political candidates to question the stated purpose of later action is particularly problematic. Candidates are not government actors, and statements of what they might attempt to achieve if elected, which are often simplified and imprecise, are not "official act[s]." *McCreary*, 545 U.S. at 862. They generally are made without the benefit of advice from an as-yet-unformed Administration, and cannot bind elected officials who later conclude that a different course is warranted. *See Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002). Permitting

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

25

campaign statements to contradict official pronouncements of the government's objectives would inevitably "chill political debate during campaigns." *Phelps v. Hamilton*, 59 F.3d 1058, 1068 (10th Cir. 1995) (declining to rely on campaign statements). It also would be unworkable, requiring the "judicial psychoanalysis" that *McCreary* repudiated. 545 U.S. at 862; *see also Mergens*, 496 U.S. at 249 ("[W]hat is relevant is the legislative *purpose* of the statute, not the possibly religious *motives* of the legislators who enacted the law . . . .") (emphasis in original); *United States v. O'Brien*, 391 U.S. 367, 383 (1968) (noting that "[i]nquiries into congressional motives or purposes are a hazardous matter").

Even considering plaintiffs' proffered extrinsic evidence, none of it demonstrates that *this Order*—adopted after the President took office, in response to specific, identifiable national security objectives that are not tied to religion—was driven by religious animus. Plaintiffs' marquee statement proves the point: they cite a 15-month-old campaign press release advocating a "complete shutdown" on Muslims' entering the country. Mot. at 2. That release and other proffered statements reveal nothing about the Order's aim, because the Order does no such thing. Far from banning Muslims indefinitely, the Order pauses for 90 days entry from just six countries previously identified as posing particular risks, which is subject to religion-neutral exceptions and case-by-case waivers. There is a complete disconnect between plaintiffs' imputed purpose and the Order's actual effect.

Plaintiffs contend (Mot. at 17) that *McCreary* requires looking behind the Order's text and legal effects to speculate at its aims. In fact, *McCreary* says the opposite. *McCreary* makes clear that what matters is not a government official's subjective motive, but only the "official objective" drawn from "readily discoverable fact." 545 U.S. at 862. As *McCreary* explained, the Supreme Court's previous cases had rested on analysis of objective facts directly related to the law at issue:

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

26

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

"In each case, the government's action was held unconstitutional only because openly available data"—a law's text or obvious effects, the policy it replaced, official public statements of the law's purpose, or "comparable *official* act[s]"—"supported a commonsense conclusion that a religious objective permeated the government's action." *Id.* at 862-63 (emphasis added); *see Lukumi*, 508 U.S. at 534-35 (gleaning purpose from ordinances' "text" and "operation").

*McCreary*'s analysis of the counties' purpose therefore centered on the text of the resolutions that serially authorized Ten Commandments displays and the features of those displays. *See* 545 U.S. at 868-74. Although the Court referred to other sources (*e.g.*, official statements made during legislative meetings) in describing the facts, *e.g.*, *id.* at 851, *McCreary*'s reasoning and holding rested on the actions the counties took and inferences fairly drawn from them, *id.* at 868-74. The Court emphatically rejected suggestions that it "look to the veiled psyche of government officers." *Id.* at 863.

The contrast between this case and *McCreary* could not be more stark. There, the religious purpose of the original resolution authorizing the Ten Commandments display was readily evident from the outset. 545 U.S. at 868-69. The counties' second resolution compounded the problem, making the religious aim *explicit*. *Id.* at 870. The counties' third and final display still showed a "sectarian spirit," since it included a different version of the Ten Commandments that "quoted more of the purely religious language of the Commandments than the first two displays had done," and, significantly, was created "without a new resolution or repeal of the old one." *Id.* at 870, 872.

Here, in contrast, the Order does not convey any religious message; indeed, it does not reference religion at all. The Revoked Order contained provisions addressing religious minorities, but—as the new Order takes care to explain—those provisions did not and never were intended to discriminate along denominational lines. Order §1(b)(iv). Regardless, the current Order

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

27

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

responded to concerns about the Revoked Order's aims by removing the provisions that purportedly drew religious distinctions—erasing any doubt that national security, not religion, is the focus. The Order also reflects the considered views of the Secretary of State, the Secretary of Homeland Security, and the Attorney General, who announced the Order and whose motives have not been impugned. In short, the President's efforts to accommodate courts' concerns while simultaneously fulfilling his constitutional duty to protect the Nation only confirms that the Order's intention most emphatically is not to discriminate along religious lines.

### D.  Plaintiffs' Equal Protection Claim is Unavailing

Plaintiffs claim that the Order violates the equal protection component of the Fifth Amendment's Due Process Clause. But again, the alien plaintiffs lack constitutional rights with respect to their request to enter the United States, and the petitioner plaintiffs are only entitled, if anything, to review under the "facially legitimate and bona fide" standard. *See Fiallo*, 430 U.S. at 796. In any event, contrary to plaintiffs' contention that strict scrutiny is the appropriate standard (Mot. at 14-15), where an equal protection claim is made to an immigration law, at most rational basis review applies. *See, e.g.*, *Mathews v. Diaz*, 426 U.S. 67, 83 (1976) (considering whether a law that made distinctions based on alien status was "wholly irrational"); *Jimenez–Angeles v. Ashcroft*, 291 F.3d 594, 603 (9th Cir. 2002) (reasoning that nationality-based classification of noncitizens satisfies equal protection if it is rationally related to a legitimate government interest.).

Under highly deferential rational basis scrutiny, a classification must be upheld so long as "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993); *see also See Yao v. I.N.S.*, 2 F.3d 317, 321 (9th Cir. 1993). Equal protection is satisfied so long as there is "a plausible policy reason for the classification, the legislative facts on which the classification is apparently

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

28

U.S. Department of Justice
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992).

The Order easily satisfies this relevant standard. From a constitutional perspective, the Executive Branch is permitted to draw distinctions based on nationality in the context of immigration and entry into the United States. *See*, *e.g.*, *Jean v. Nelson*, 727 F.2d 957, 978 n.30 (11th Cir. 1984) (en banc), ("[T]here is little question that the Executive has the power to draw distinctions among aliens on the basis of nationality."), *aff'd on non-constitutional grounds*, 472 U.S. 846 (1985); *Narenji*, 617 F.2d at 748 ("[C]lassifications among aliens based upon nationality are consistent with due process and equal protection if supported by a rational basis."); *Rajah*, 544 F.3d at 435 (2d Cir. 2008) (similar); *Appiah v. INS*, 202 F.3d 704, 710 (4th Cir. 2000) (similar). Here, the President's determination that nationals from the six countries identified are associated with a heightened risk of terrorism creates a rational basis for the Order.

Plaintiffs also allege that the Order violates the Equal Protection Clause because it stems from "religious animus against Islam." (Mot. at 15.) But that argument is equivalent to plaintiffs' religious-discrimination claim under the Establishment Clause, and it fails for the same reason

### E. Plaintiffs Find No Relief From The Administrative Procedure Act Or Mandamus Act

Plaintiffs fail to establish a substantial likelihood of success on the merits under the Administrative Procedure Act ("APA") and the Mandamus Act for several reasons. First, Plaintiffs cannot state a claim under the APA against the Order because the President is not an "agency." In *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), the Supreme Court concluded that the Presidency is not an agency as defined in the APA, § 701(b)(1). Courts have interpreted *Franklin* to prohibit review under the APA of actions by the President when he is

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

29

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

exercising discretionary authority. *See, e.g.*, *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 104 (D.D.C. 2016). Here, Congress has granted the President authority to suspend entry for any class of aliens if he finds that such entry would be "detrimental to the interests of the United States." 8 U.S.C. § 1182(f). Pursuant to, and without exceeding, that grant of discretionary authority, the President issued the Order and suspended entry of aliens from the six subject countries. The President's action is thus unreviewable under the APA. *See Detroit Int'l Bridge*, 189 F. Supp. 3d at 104-05.

Second, the APA precludes judicial review of any agency action that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Webster v. Doe*, 486 U.S. 592, 594, 600-01 (1988) (holding that the Director of Central Intelligence had complete discretion over employee discharges, and thus judicial review was precluded). By its plain terms, 8 U.S.C. § 1182(f) vests discretion in the President to determine whether "the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States," for the period "as he shall deem necessary," and to impose such conditions of entry as "he may deem appropriate." As a result, there is no discernable standard for judicial review of the President's determinations. *See Haitian Refugee Ctr., Inc. v. Baker*, 789 F. Supp. 1552, 1575-76 (S.D. Fla. 1991). Thus, even if plaintiffs could challenge a presidential finding under the APA, the challenge would necessarily fail under these circumstances.

Third, to the extent the alien plaintiffs seek APA review, as explained *supra*, they have no right of admission into this country.[12] Therefore, plaintiffs have no likelihood of success on the merits of a claim under the APA seeking to require the government to admit them into this country.

_____

[12] Insofar as plaintiffs are reasserting constitutional claims under the APA, their claims necessarily fail for the reasons stated earlier.

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

30

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

The INA confers upon consular officers the exclusive authority to adjudicate visa applications. *See* 8 U.S.C. §§ 1104(a), 1201(a); *see also* 6 U.S.C. § 236(b), (c). It is well established, however, that "[o]btaining a visa from an American consul has never guaranteed an alien's entry into the United States. A visa merely gives the alien permission to arrive at a port of entry and have an immigration officer independently examine the alien's eligibility for admission." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1157 (D.C. Cir. 1999) (citing 8 U.S.C. § 1201(h)); *see also* 8 U.S.C. § 1154(e). Any suggestion to the contrary by plaintiffs is incorrect.

Fourth, the APA affords no relief to the petitioner plaintiffs who claim a constitutionally-protected interest in their family life that would entitle them to judicial review of a consular officer's visa refusal decision. APA review for arbitrary and capricious decision-making is incompatible with the limitations imposed by the doctrine of consular nonreviewability, which qualifies as one of the "limitations on judicial" review that overcomes the APA's presumption of reviewability. *See* 5 U.S.C. § 702(1) ("Nothing herein . . . affects other limitations on judicial review . . . ."); *Saavedra Bruno*, 197 F.3d at 1160-62 (the APA does not disturb the general rule that no judicial review is available regarding the decision to exclude an alien from the United States). Because any judicial review of those plaintiffs' claims would necessarily be limited to whether the decisions qualify as facially legitimate and bona fide, review under the APA does not apply. *Id*.; *Mandel*, 408 U.S. at 770.

Finally, with respect to plaintiffs' request for relief under the Mandamus Act, their claim fails because they do not identify any discrete agency action that is legally required. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63-64 (2004). As discussed, to the extent plaintiffs claim that Congress's delegation through § 1182(f) is limited by 8 U.S.C. § 1152(a)(1)(A) (Mot. at 13-14), § 1152(a)(1)(A) does not address—and thus does not circumscribe—the President's authority

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

31

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

under § 1182(f).  Thus, Plaintiffs cannot use the APA or the Mandamus Act to challenge the Order.

### III.    PLAINTIFFS HAVE NOT SHOWN IMMEDIATE, IRREPARABLE HARM

Plaintiffs' request for emergency injunctive relief independently fails because they cannot show "irreparable harm." *Winter*, 555 U.S. at 20.  To secure an injunction, plaintiffs "must do more than merely allege imminent harm sufficient to establish standing"; they "must *demonstrate* immediate threatened injury" that only "preliminary injunctive relief" can prevent.  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original).

Examining the alleged circumstances of the alien plaintiffs, not all of them have completed the steps necessary to be placed into the queue for visa application interview scheduling, and those who have have already been waiting for months.  ECF No. 58, 9-13.  Of the six alien plaintiffs, three alien plaintiffs have not yet applied for a visa.  *See* Ex.  The other three applied for immigrant visas but their applications were refused under 8 U.S.C. § 1201(g) on March 13, 2017, for reasons that include failing to provide proof of a relationship with the petitioner.  *Id*.  Given their posture in the visa process, none of these plaintiffs—or their petitioning family members—can demonstrate the type of immediate, irreparable harm necessary to obtain a temporary restraining order or preliminary injunction.

Regardless, as "close family members," every alien plaintiff is a strong candidate for a waiver allowing entry under Section 3(c)(iv) of the Order if they are found otherwise eligible for visas, such that Plaintiffs cannot plausibly argue that but for an immediate injunction, they will be denied a visa or entry to the United States because of some impermissible reason.  Accordingly, under the present circumstances, plaintiffs' any legitimate claim of immediate, irreparable harm is purely speculative.  *See Caribbean Marine*, 844 F.2d at 67 (where multiple contingencies must occur before an injury would become a concrete harm, the injury was "too speculative to constitute an irreparable harm justifying injunctive relief").

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

32

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

## IV. THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH STRONGLY AGAINST EMERGENCY RELIEF

The government and the public's interest—which merge here, *see Nken v. Holder*, 556 U.S. 418, 435 (2009)—counsel strongly in favor of leaving the Order in effect. The President, in consultation with the Attorney General and the Secretaries of State and Homeland Security, determined that, while the review of screening and vetting procedures is ongoing, the "risk of erroneously permitting entry" of an individual who intends to commit terrorist acts "is unacceptably high." Order §1(f). That risk assessment provides more than sufficient basis to leave the Order's temporary, precautionary safeguards in place.

Experience and empirical data already demonstrate the ability of would-be terrorists to infiltrate the country through cracks in screening and vetting processes; some 300 persons who entered as refugees are currently under investigation, and hundreds of foreign-born persons have been convicted of terrorism-related crimes. Order §1 (h). Given that reality, the Executive's obligation, and the Order's aim, is to predict where the greatest risk exists *going forward*. The Order reflects such prediction, identifying six countries that Congress and the prior Administration had found present a "heightened risk" that possibly inadequate screening could enable terrorist infiltration. Order § 1(e). The Order further details the specific concerns with each of the six countries (and why Iraq now presents a different circumstance). *Id.* § 1(e), (g).

The Order thus reflects the Executive's "[p]redictive judgment," which is entitled to the greatest possible degree of judicial deference. *Dep't of the Navy v. Egan*, 484 U.S. 518, 527-29 (1988). Such judgments "have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry," as they "are delicate, complex, and involve large elements of prophecy," and are "of a kind for which the Judiciary has neither aptitude, facilities nor responsibility." *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948). "[W]hen

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

33

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

it comes to collecting evidence and drawing factual inferences in this area, the lack of competence on the part of the courts is marked, and respect for the Government's conclusions is appropriate." *Holder v. Humanitarian Law Project* (*HLP*), 561 U.S. 1, 34 (2010) (internal citation omitted).

The "evaluation of the facts by the Executive" to support predictive judgments is especially "entitled to deference" when "litigation implicates sensitive and weighty interest of national security and foreign affairs." *HLP*, 561 U.S. at 33-35. When the Executive adopts "a preventive measure" in order "to prevent imminent harms in the context of international affairs and national security," the government "is not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusions." *Id.* at 35. Thus, where "[t]he Executive … deem[s] nationals of a particular country a special threat," "a court would be ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of that determination. *Reno v. American-Arab Discrimination Committee*, 525 U.S. 471, 491 (1999).

Plaintiffs offer nothing that could plausibly justify disregarding the considerable deference due to the Executive's analysis and predictive judgments. The best they muster is a leaked draft report asserting that "not a single fatal terrorist attack" has already been carried out by a foreign national of one of the six countries subject to the suspension. Mot. at 5 n.21. That single draft document could not possibly overcome the final assessment of the President and multiple Cabinet Secretaries. Joint Ltr. to President (Mar. 6, 2017); *see NAHB*, 551 U.S. at 658-59. More fundamentally, plaintiffs miss the point: the Order's objective is to prevent future terrorist attacks *before* they occur. And that is precisely why the Order focuses on six countries that Congress and the prior Administration recently determined pose the greatest risk of terrorist infiltration in the future.

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]                                    34

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

## V.    CONCLUSION

Plaintiffs' motion for emergency injunctive relief should be denied.

DATED this 14th day of March, 2017.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
District Court Section

GISELA A. WESTWATER
Assistant Director

EREZ REUVENI
Senior Litigation Counsel

 _/s/ Stacey I. Young_
STACEY I. YOUNG, DC Bar #499324
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 598-2445
Fax: (202) 305-7000
stacey.young@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system which will send notification of such filing to the attorneys of

record for the Plaintiffs.

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

35

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044

DATED this 14th day of March, 2017.

_/s/ Stacey I. Young_
STACEY I. YOUNG, DC Nar #499324
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-7171
Fax: (202) 305-7000
stacey.young@usdoj.gov

DEFENDANTS' OPPOSITION TO EMERGENCY
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
[Case No. 2:17-cv-00135-JLR]

36

**U.S. Department of Justice**
P.O. Box 868
Ben Franklin Station
Washington, D.C. 20044